## THE BATTLER.

### NEALL v. SCHRADER.

(Circuit Court of Appeals, Third Circuit. February 18, 1896.)

1. TOWAGE—UNSAFE ANCHORAGE—CUSTOM USAGE.

The Brown anchorage, in Delaware Bay, *held*, on the evidence, and especially in view of the fact that vessels of all kinds, including barges, habitually anchor there when weather-bound, to be a safe and proper anchorage for coal-laden, sea-going barges, while awaiting the subsidence of unfavorable easterly weather; and that a tug having such barges in tow was not liable for their loss during an extraordinary and terrific gale, either for anchoring them at that place in the first instance, or for not removing them further up the bay before the storm broke. 55 Fed. 1006, reversed.

2. SAME—DUTY OF TUG—DISCRETION OF MASTER.

A mistake of judgment on the part of the master of a tug in selecting an anchorage for his barges does not render the tug liable for their loss, where such mistake is only manifested by the result, and it appears that the master exercised reasonable skill and judgment, in view of the circumstances existing at the time.

3. SAME—TUG LEAVING BARGES AT ANCHOR.

The fact that a tug which anchored certain sea-going barges at the Brown anchorage, in Delaware Bay, pending threatening weather, and left them at their anchorage, and engaged in other towage in the meantime, *held* no ground of liability for their loss during an extraordinary storm, where it appeared that the barges were equipped with all the appliances for safe anchorage and were as capable of riding out a gale as full-rigged ships, that it was the common practice for tugs to leave barges so anchored, and that, even if the tug had been present, she would have been unable to prevent the disaster. 55 Fed. 1006, reversed.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

This was a libel in rem by John J. Schrader, owner of the barges Tonawanda and Wallace, against the steam tug Battler (Frank L. Neall, trustee, claimant), to recover for the loss of the barges through the alleged negligence of the tug. The district court rendered a decree for libelant (55 Fed. 1006), and the claimant appealed.

J. Rodman Paul and John G. Johnson, for appellant.

Edward F. Pugh and Henry Flanders, for appellee.

Before ACHESON and DALLAS, Circuit Judges, and WALES, District Judge.

ACHESON, Circuit Judge. The fundamental question here is whether the anchorage of the Brown, in Delaware Bay, 2 or 3 miles to the eastward of the buoy of the Brown, and about 8 or 10 miles from sea, where the master of the steam tug Battler brought to anchor the barges Tonawanda and Wallace, on the afternoon of Thursday, September 5, 1889, was a safe and proper place of anchorage for these barges, such as an experienced, competent, and prudent master of a towing tug would have selected for the purpose, under the surrounding circumstances. The Tonawanda and Wallace were sea-going barges of heavy draught, that of the former being about 21 feet. They carried suitable anchors and chains. Originally, they were ocean-sailing vessels, but they had been fitted up for towage in the coastwise coal trade, by reducing the height of the masts, which were equipped with fore and aft sails only. They were, however, quite as capable of riding out a gale as full-rigged sailing vessels. On Wednesday, September 4th, these barges, which were loaded with coal, were taken in tow at Philadelphia by the steam tug Battler, Capt. Tingle being master, under an agreement to tow them from Philadelphia to Boston. When the tug reached the anchorage of the Brown, the wind was easterly, the atmosphere was hazy, and an easterly swell was setting in. In this state of the weather the master of the Battler deemed that it would not be prudent to take the barges out to sea, and therefore he brought them to anchor, as above stated, to await a favorable change of weather.

In this connection, and as aiding in the just solution of the question with which this opinion opens, two facts may properly be mentioned. In the preceding month of June, the steam tug Argus, Capt. Bernard being master, had in tow these same two barges, Tonawanda and Wallace, outward bound, and, the weather proving unfit to go to sea, the Argus put the barges in the anchorage of the Brown to await good weather, and they lay there for two days before the voyage was resumed. Again, on the evening of Saturday, September 7, 1889, the steam tug C. W. Morse, Capt. Blair being master, having in tow the barges Casilda and St. Cloud, passed down Delaware Bay and went as far outwardly as the Over Falls, when, finding that the weather outlook was unfavorable, the Morse brought back her barges, and anchored them at the Brown anchorage, in proximity to the barges Tonawanda and Wallace, to await good weather. These four barges remained thus at anchor at the Brown anchorage until Tuesday, September 10th, on which day they were struck by an extraordinary and terrific gale, and all of them were lost in the storm.

Before taking up the principal question, two preliminary matters will be considered: First. It was contended by the libelant in the court below, and it is insisted by him here, that the Battler was in fault in not continuing her voyage on Thursday afternoon, or, at least, was blameworthy in not resuming the voyage on Thursday night, or on Friday morning. Upon this point, however, the

judgment of the district court was favorable to the tug. In that conclusion we concur. It is shown by the decided weight of the evidence that it would have been imprudent for the Battler to venture out to sea with two barges in tow at any time after the barges came to anchor on Thursday afternoon before the disaster occurred. Even Adams, the mate of the Tonawanda, and a witness for the libelant, expresses that opinion. In view of the indications as to the condition of the weather out at sea, the master of the Battler, we think, acted wisely in declining to proceed on the voyage, or to resume it. Second. It is alleged that the captain of the barge Tonawanda requested the master of the tug not to go below Fourteen-Foot Bank, an anchorage in Delaware Bay several miles above the Brown anchorage, if he was not going to sea, and that the master of the tug signified his assent to the request. This, however, is denied, and these two persons differ as to what passed between them. But whether or not the alleged request was made is a matter of no great moment. The duty and responsibility of selecting a suitable place of anchorage rested upon the master of the tug.

The question, then, recurs, was the anchorage of the Brown a safe and proper one for the barges Tonawanda and Wallace under the circumstances? Upon this question there is great diversity of opinion between the witnesses on the one side and the other. Many of the witnesses make a comparison between the anchorage of the Brown and the Fourteen-Foot Bank anchorage, stating, respectively, why they prefer the one or the other as a place of security. The evidence tends to show that light-draught schooners generally seek Fourteen-Foot Bank, because they can anchor in on the flats in that locality, to the eastward of the deep-water channel. The actual experience of a number of the libelant's witnesses was with schooners of light draught. On the other hand, the respondent's witnesses speak particularly of vessels of heavy draught, to which class of vessels the barges Tonawanda and Wallace belonged, and they give reasons for their regarding the anchorage of the Brown as a safe and proper harbor for barges like the Tonawanda and Wallace in easterly, heavy weather. Here, in point of numbers, the score is somewhat on the side of the respondent. Now, certainly, the witnesses for the libelant are not superior to those of the respondent, either in intelligence or in nautical skill and experience. If the question whether the Battler selected an anchorage suitable for the occasion turned upon the mere opinions of unbiased and competent witnesses, the scale, we think, would fairly incline to the side of the respondent. The case, however, does not depend wholly upon nautical opinion. There is a great fact, indisputably established, which, in our judgment, is decisive. It clearly appears that vessels of all kinds—schooners, brigs, barks, ships, steamers, and barges—habitually anchor in the anchorage of the Brown when weather-bound. It is shown that the Brown anchorage is frequented both by sea-bound vessels (including barges), when detained by threatening weather, and awaiting a favorable change,

and by vessels which come in from sea for a harbor of safety. Numerous witnesses on the side of the respondent so testify, from personal knowledge and experience. Capt. Gibbons, a witness for the libelant, who expresses the opinion that the anchorage at Fourteen-Foot Bank is safer than the anchorage of the Brown, nevertheless, upon cross-examination, thus testifies:

"Q. You have often seen vessels,—barges,—have you not, anchored at the anchorage of the Brown? A. Yes. Q. Is it a usual and frequent place of anchorage? A. Yes; anchor there very often. Q. Vessels making a harbor from storm and sea anchor there frequently, don't they? A. Yes, sir. Q. Bound up the coast, I mean. A. Yes, sir. Q. Barges do, and vessels and barges waiting for good weather to go to sea frequently anchor there? A. Yes, sir. Q. It is considered, is it not, a safe anchorage for any ordinary weather? A. Well, for ordinary weather, yes."

The evidence on this subject, coming from the respondent's own witnesses, is still more favorable to him, and fully warrants the finding that it has been the common practice of barges, on their way to sea, and hindered by bad weather, to anchor at the Brown anchorage, and lie there awaiting good weather. Having regard, then, to all the proofs, it seems to us that, upon the question whether the anchorage of the Brown was a safe and proper one for the barges Tonawanda and Wallace on this occasion, the clear preponderance of the evidence is with the respondent. We are of the opinion that the principal charge of negligence here made, viz. that the tug anchored the barges in an improper place, is not sustained.

But, even if the proofs did not completely vindicate the tug's choice of an anchorage, still, in view of the conflict of opinion between the two sets of nautical witnesses, and under the facts shown, the utmost that could fairly be alleged against the master of the Battler would be that he made a mistake of judgment, as manifested by the result. The James P. Donaldson, 19 Fed. 264. A mere mistake of judgment, however, under the circumstances, is not enough to fasten liability upon the owner of the tug. Id.; The Packer, 28 Fed. 156. As was said by the court, in Lawrence v. Minturn, 17 How. 100, 110, the owners of a vessel are obliged to appoint a master having reasonable skill and judgment, and they are liable to those who suffer through his failure to possess or exert these qualities; "but they do not contract for his infallibility, nor that he shall do, in any emergency, precisely what, after the event, others may think would have been best." In the case of The W. E. Gladwish, 17 Blatchf. 77, 83, Fed. Cas. No. 17,355, Chief Justice Waite said:

"The tugs undertook to bring to this work such prudence and such nautical skill as was ordinarily required in such navigation. More was not contracted for, and more was not expected. When the ice was reached it became necessary to determine whether to lie by or to go on. This involved the exercise of judgment as to what ought to be done under the circumstances. A mere mistake is not enough to charge the tugs with any loss which follows. To make them liable, the error must be one which a careful and prudent navigator, surrounded by like circumstances, would not have made."

The master of the Battler is to be judged by the state of affairs which existed when he acted, and not by the after event. When he brought the barges to anchor, no storm was prevailing. The weather indications, then, were simply such as to make it imprudent for the tug to tow two barges out to sea. In selecting for the barges the anchorage of the Brown to await a change of weather, the master of the tug did no unusual thing. He did that which competent and careful navigators were in the habit of doing. Upon the whole case our conclusion is that the master of the Battler was not culpable in anchoring the Tonawanda and Wallace in the place selected by him.

The evidence amply justifies the belief that the barges would have ridden out, in entire safety, any ordinary storm. The catastrophe was occasioned by a storm of exceptional violence and of sudden occurrence. Capt. Gibbons, the libelant's witness already quoted, who lay with his tug within the Delaware breakwater, characterizes the storm as "very extraordinary," and says:

"I had no idea whatever that there was such a gale coming on. * * * Came up to me unexpectedly. I seen the wind to eastward, but I did not think it would increase to such force."

And he adds that, until the storm was actually on, he had no idea whatever that anything like it was going to happen. The captain of the Tonawanda, in response to the question, "When was it the first time, that it [the wind] became dangerous,—what day was the first day that it became dangerous, in your opinion?" answered, "Monday night." This agrees with the testimony of Capt. Blair, the master of the C. W. Morse, who, speaking of Monday night, states:

"That night I laid down as usual. The glass was on 30, and had been there ever since Saturday, and 30 is a good glass; and I heard the wind, about midnight, spring up and blow, and I jumped up and dressed."

The weather record kept at the lighthouse at the breakwater contains this entry, under date of Monday, September 9th, with respect to the night of that date:

"Midnight: Cloudy, northeast gale; wind shifting to north-northeast, about midnight, to a hurricane, increasing in violence during balance of night."

Capt. Hall, the lighthouse keeper, testifies that he "never saw a storm to compare with it." The extreme violence of the gale can be appreciated, when it is stated that about 30 vessels, at different points in Delaware Bay, were sunk or driven ashore.

What has been said disposes of the complaint that the tug did not remove the barges to Fourteen-Foot Bank. If the selected anchorage was a proper one for barges awaiting good weather to go to sea, surely it was not negligence to let them lie there for the desired and expected change. A removal would have been a very unusual thing. The master of the Battler had no reason to anticipate the extraordinary storm which did the mischief. Moreover, whether the barges would have fared better had they been at Fourteen-Foot Bank is problematical. The witness Fowler testifies,

positively, that he saw three schooners, which were at anchor on the Maurice River flats, go ashore in the storm. There is other evidence as to the position and loss of these vessels, and the fact that such disaster at the Fourteen-Foot Bank anchorage occurred is, we think, shown.

It only remains for us to consider the charge that the Battler was away from the barges much of the time while they lay at the Brown anchorage, and especially when the loss happened. We have already seen that the Tonawanda and Wallace were ocean barges, equipped with all the appliances for secure anchorage, and that they were as capable of riding out a gale as full-rigged ships. In easterly threatening weather, when it is deemed unwise to tow such barges out to sea, the usage in the trade is for the tug to bring them to anchor at some secure place, to await good weather. Then, if the barges are in good order, well manned, and securely anchored in a proper place, in the absence of special reason to the contrary, it is a common practice for the tug to leave the barges temporarily, and take other work. Undoubtedly, the owner of the Tonawanda and Wallace knew this; for in the month of June, 1889, after the tug Argus had placed these barges in the Brown anchorage, the tug left them at anchor, and towed a bark to Philadelphia. The Battler did the same thing on this occasion. During its absence the tug was not needed by the barges, and nothing befell them. The Battler was back by 1 o'clock of Saturday morning, and then went down beyond the Over Falls to see how the weather was out at sea. During the greater part of Saturday the tug lay with the barges. Afterwards the tug lay within the Delaware breakwater. This, it is shown, was and is the common practice of tugs when their barges are at the Brown anchorage. On the afternoon of Sunday the Battler again went down below the Over Falls to ascertain the condition of the weather outside, and found that hazy, easterly weather still prevailed at sea. The presence or absence of the tug was a matter of no consequence. The Battler, if present, could have done nothing to avert the calamity. The more powerful steam tug C. W. Morse, although present with her barges, was unable to do anything whatever to save them. The great storm brought unavoidable destruction to the Tonawanda and Wallace, as it did to so many other vessels.

Under all the circumstances, we are not able to see that the owner of the Battler is justly chargeable with the loss of the libelant's barges.

The decree of the district court is reversed, and the cause is remanded, with a direction to enter a decree dismissing the libel of John J. Schrader, and adjudging him to pay the costs in the court below in No. 79 of 1889, and the costs of this appeal.