THE H. S. BEARD.    THE EDITH BEARD.    THE SCOW NO. 10

(District Court, E. D. New York.    December 7, 1904.)

**1. COLLISION—YACHT AND SUBMERGED SCOW IN TOW—FAILURE TO MAINTAIN LOOKOUT.**

The failure of a steam yacht navigating New York Harbor at a speed of 16 miles an hour to maintain a lookout was a fault and a contributing cause of a collision between the yacht and a submerged scow in tow, where a vigilant lookout might have seen the scow or noted her position from the hawser with which she was being towed.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 211.]

**2. SAME—DANGEROUS TOW—DUTY OF TUG TO MARK POSITION OR GIVE WARNING.**

Two tugs towing a submerged scow in New York Harbor, which moved forward in an erratic course, not at all times following directly behind the tugs, *held* in fault for a collision between the scow and a meeting yacht on the ground that their tow was a dangerous obstruction to navigation, and they were negligent in not placing a signal upon it, or giving notice to the yacht of its presence and position, otherwise than by the blowing of an alarm signal when the yacht was approaching and the shouting of the crew as she passed, neither of which was intelligent to the master of the yacht, but rather calculated to distract his attention from the obstruction ahead.

In Admiralty.    Suit for collision.

William M. Ivins and Joseph Kling, for libelant.
Albert A. Wray and Charles D. O'Connell, for claimants.

THOMAS, District Judge.    The steam tugs Henry S. Beard and Edith Beard, lashed together and heading about south, were towing scow No. 10, submerged.    The bow of the yacht Arrow, heading about north one-half west, collided with a corner of the scow, on the port side of the tugs.    For the injury received this libel is filed. The accident happened about 1,000 feet southerly of Red Hook, and about half way between the Erie Basin Gap and Red Hook Point, Brooklyn, and about 600 feet off shore.    The day was clear, the tide was flood, the hour was 5:10 p. m., the date August 8, 1903. The Arrow was going at the rate of 16 miles per hour, her maximum speed being 45 miles per hour.    The tow was proceeding very slowly, probably not to exceed one mile per hour, as the scow was lying approximately athwart the channel and towed with erratic movement.    This position of the scow arose from the fact that earlier in the day the hawser parted, whereby the scow was lost, and the tugs, sweeping the channel with a line, encompassed her in the line, and continued to carry her along without further adjustment of the hawser.    The scow was 110 feet long, and it is concluded that, in addition to her own lateral projection across the stern of the tug, she also dragged the hawser to port as the towing proceeded.    The towing began in the forenoon, and, with vicissitudes and interruptions, had lasted to the time of the accident, and was then incomplete.    While the towing proceeded, after the scow was picked up after sinking in the channel, parts of her at times showed above the water, so that approaching vessels could see her without

difficulty, and at times she was completely or mostly submerged, her appearance and disappearance varying in degree and duration. At the time of the collision, to a casual observer or to a person not strictly attentive to her, she probably appeared to be submerged entirely; but it is inferable that at the place and time of collision a small part of her showed above or appeared near the surface of the water. As to this there is a conflict of evidence; but it is believed that the question whether her corner could be seen depended upon proximity, opportunity to observe, and attentive observation. A person knowing where she was, and following her with the eye, as she disturbed the surface of the water, could probably have seen her corner rising slightly above the surface. Kelean, on the Arrow, states that he saw her just before the collision, and there is no occasion to doubt his evidence in the matter of honesty, although he was not a lookout and of no value as a navigator. Packard, the Arrow's master, testified:

"Q. Can you give me any idea of the height that the object rose above the water? How did it appear to you to be? A. The scow? Q. How much out of water? A. There wasn't any portion of it that I could see out of water possibly. In salt water you can see two or three feet below the surface when you are directly over it. Q. When you were over it, you saw it through the water? A. Yes, sir; through the water."

The Arrow nearly cleared her, but struck the corner nearest the shore, as Packard states, about 18 inches below the water line. The claimant urges that the scow was towing end forwards, nearly straight behind the tugs, and that the Arrow hit her only because she changed her course to the westward while or after passing the tugs. The master of the Arrow states that he did not change his course, and his excellence as a witness leaves no room to doubt his statement. It is true that the witnesses for the claimant testify that the Arrow changed her course, Capt. Nevins stating that she changed to the westward several points, even placing her at the time of the collision at right angles to the course of the tugs. The libel charges that she changed slightly to the westward. But, if it becomes a matter of credibility or accurate statement of fact, the court unhesitatingly accepts the evidence of the master of the Arrow as to what he did on his own vessel; for his capacity is undoubted, and his integrity on the witness stand was manifest. Therefore it must be concluded that the Arrow passed the nearer tug at a distance of about 100 feet; that she did not change her course before the collision; that the hawser swung enough to port to allow the already laterally projecting scow's end to obstruct slightly the Arrow on the course she was pursuing. It may be remarked, however, that whether the Arrow starboarded does not appear very important, except as it does or does not emphasize the negligent interruption of the channel by the tugs and their tow.

Were either or both of the parties negligent? The Arrow was going at a high rate of speed for harbor navigation. That in itself was not negligent; but it is an important fact as bearing upon the question of the means used by her to safeguard herself and other vessels with which she came in relation. She carried no lookout

by day, although she had a full crew. Kelean was on deck, but he was useless and was not used. Capt. Packard does not even entertain the idea that Kelean had any such function or ability to perform it. Here there is an acknowledged violation of law. It cannot be excused. The effect of the omission cannot be ascertained, but it places the burden upon the libelants of showing that the accident would have happened had the injunction of the law been fully met. This burden they have not fulfilled. But, if the hawser led to port, a vigilant lookout might well have seen it leading almost directly in front of his vessel, on a bright August day. If the inert and unobservant Kelean saw something of the wreck before the collision, a dutiful and keen lookout, such as this swift boat demanded, might have seen it earlier, or earlier caught view of the line and the place to which it led. The value of a lookout is especially emphasized by the fact that Capt. Packard kept his head towards the persons on the tug, seeking no doubt to understand the significance of their cries and gestures. He had then ceased to be a lookout. Another man, with eyes ahead, might have performed the duty from which for the moment he was diverted. Hence it is decided that the failure to maintain a proper lookout on the Arrow was one proximate cause of the collision.

Were the claimants also guilty of neglect that contributed to the injury? What did the tugs omit? They placed no signs, buoys, or other warnings on the submerged tow. It is urged that the captain of the Arrow would not have seen them if present, as he was looking at the people on the tug. That is by no means certain. As he was approaching the tugs he might well have seen such signals. In any case, if it was the duty to place signals on the scow the claimant should not be relieved from failure to do so, on the plea that the Arrow's lookout would not have seen them, because he was diverted by the substituted warnings on the tugs. But it is stated and proven that it is not usual to place signals on submerged vessels in tow. There is no reason for omitting practicable signals on submerged vessels, towed in a used navigable channel, unless some other suitable means of warning be employed. If a tow is hid by darkness, its existence must be foretold by lights. If a tow is hidden in the water, some equivalent warning should be given. The outlying hawser is not warning. The vacillating and occasional or even continued appearance of a corner of the vessel out of the water is not a sufficient warning. But the persons on the tug shouted. Nevins, master of the Henry S. Beard, testified:

"Q. After you blew these alarm signals to her what next occurred? A. As soon as she got about abreast of us I run out of the pilot house, and all were shouting on the Edith and on our boat to 'Keep off! We have got a scow in tow!' Q. Did they do anything else besides shout? A. Mr. Hurley was shaking a newspaper in his hand, and they were all hollering about the same time."

Now, consider the situation. The tow was not over 300 feet away, measuring from the bow of the tugs. There was an unconcerted cry to keep off. The words must have been utterly unintelligible. Hence what was said had no significance then or now.

Therefore the master of the Arrow is to be judged as one who saw men gesticulating and calling incoherently to him on two tugs safely out of his way. Such actions and speech were but vain antics and confusing noises, given to a rapidly passing vessel, in whose way was being dragged a substantially concealed scow. Some later allusion will be made to them. But the claimant urges that alarm whistles were blown. Capt. Packard testified that there was no whistle. Kelean testified that he "did not hear any signal." Johnson, employed on the wrecking steamer Reliance, and waiting near by to raise the scow, testified that he did not hear any signals or whistles; and Frank Smith, mate of the Edith Beard, testified that no signal or whistle was given by the Beard. His evidence as to his actual presence on the Beard is burdened by the attempted corroboration of the unbelievable witness McCormick. On the other hand, several persons, all at some time employés of the claimants, testified that whistles were blown at the several distances named by each.

Harrigan, master of one of Beard's dredges, testified that he was on the after deck of the Henry S. Beard's house:

"Q. Did you see or hear anything done on either of the tugboats in the way of giving warning to her? A. Yes; I heard the lookout on the head of her sing out to the captain of the Arrow. Q. Then what happened? A. I heard him blow his whistles. Q. Heard whom? A. Somebody in the pilot house. Q. Of the Henry S.? A. Yes, sir. Q. What kind of whistles did he blow? A. Short toots—blasts. * * * Q. When the shouting first began how far away down the bay from you was the Arrow? A. Oh, 400 or 500 feet ahead of the boats—abreast of the boats—coming towards us when they first commenced to make signals to holler to him. He was off the gap when they commenced tooting the whistle; about halfways on the breakwater. Q. How far would that be away from where the tugs were? A. Quarter of a mile."

He says that he first saw the Arrow when about 400 feet away. This witness states further that:

"I see him after he (Arrow) passed the gap; that is the first I seen him. Q. Did you see him coming around the breakwater? A. No, I didn't; I see him when he passed the gap. Q. How far is the gap from the breakwater? A. 300 feet. * * * Q. How far was he away when you saw him? A. 500 or 600 feet ahead of us."

The evidence of this witness as to the distance of the Arrow away at the time of the whistles is not very satisfactory.

Nevins, the master of the Beard, testified that he saw the Arrow.

"Q. Where did you see her—where was she? A. Coming up along the breakwater. Q. Whereabouts? A. About halfway between Crane's and the mouth of Erie Basin Gap. Q. About how far away should you say that to be? A. I guess that would be 1,500 or 1,600 feet; maybe a quarter of a mile or little over. Q. What did you do when you saw her, if anything? A. We blowed alarm signals at her. Q. At once? A. Yes, sir; we were just after blowing again at the South Brooklyn, a 39th street ferryboat coming along."

This is the witness who stated that the Arrow sheered within 50 feet of the stern of the tugs, across their sterns.

"Q. I understand you to say the Arrow struck you—your scow—at right angles? A. Yes, sir; she changed her course as soon as she went under our stern. Q. How many points? A. She must have changed it three or

four points. Not quite at right angles, but more on the bluff. * * * Q. He was looking back at you all the while? A. Yes, sir; never took his head off us."

The recollection of such witnesses must be taken with considerable allowance.

Edwardson, a deck hand on the Henry S. Beard, and a person of dull appearance, testified that he noticed the Arrow when she swung around the breakwater coming from Tebo's 400 or 500 fathoms away, and that he said to the captain of the Henry S. Beard, "There comes the Arrow."

"Q. What did the captain do, do you know? A. He signaled out to him."

Johnson, who was a deck hand and in the pilot house of the Henry S. Beard, a person apparently honest but not of quick intelligence, testified that he saw the Arrow, a "little after he passed Crane's Shipyard," at the mouth of Gowanus; that Edwardson sung out, "There comes the Arrow."

"Q. What was done then? A. Captain blowed the alarm whistle. Q. How far do you think that is down there to Crane's yard, or where the Arrow was at that time? A. That distance— I can't measure that; it is a good ways off. Q. An eighth of a mile, quarter of a mile, half a mile, or a mile? A. It is about quarter of a mile."

Barker was the master of the Edith Beard. He says that when he first discovered the Arrow—

"Her tugs were abreast of Burtis's; that is, half way between Burtis's and the Erie Basin Gap. * * * Q. That is how near to the gap? A. I should judge about 500 or 600 feet. * * * Q. At this time, when you first discovered the Arrow, where was the Arrow? A. She was pretty close to the gap—about 500 or 600 feet, I should judge—when I first saw her. Q. 500 or 600 feet what—from where? A. From the head of the boat. Q. From your boat? A. From our boat. Q. She was about 500 or 600 feet away from you when you first observed her; is that it? A. Yes. Q. What did you do when you saw her? A. The deck hand on the Henry S. hollered, 'Here comes the Arrow.' Q. Is that what called your attention to it? A. That called my attention to it. * * * Q. As she came up to you, what took place on the Edith and the Henry S.? A. The Henry S. blowed signals, tooted her signals—that is, alarm signals—and the man on the bow of the Henry S. drawed my attention, and I got out of the port side of my pilot house, and I hollered at him to keep off. He was abeam then. Q. He was abeam of you then? A. He was abeam of us then; yes. Q. When was the first shouting to the Arrow? Where was the Arrow then? A. She goes so quick she was little bit ahead; and she was abeam when we commenced to holler to her. * * * Q. Did you continue to observe the master of the Arrow as he passed you? A. I did. Q. And after he passed you? A. Yes. Q. What was he doing all the time you were shouting? A. He kept turning and looking over and shaking his hand—shaking his left hand over his left shoulder."

McGowan, deck hand on the Edith Beard, testified that he first saw the Arrow—

"When she turned right around from Crane's and come up the bay. * * * Q. What was done on the tugs when you saw the Arrow coming up there by Crane's? A. He got a signal to keep off. Q. What is that signal? A. An alarm whistle—alarm signal. Q. Did the Henry S. or Edith blow it? A. The Henry S. * * * Q. Was anything else done on the Edith or Henry S. to attract his attention? A. We hollered to keep off. Q. Was he up alongside of you at that time? A. He was right abreast of us. Q.

Was that the first time you hollered to keep off? A. Yes. * * * Q. What was he (master of the Arrow) doing all the time he was passing you? A. He was standing at the rail, his two arms folded, and right arm like that on his breast, and he kept looking back and still waving, and then he would fold his arms again; he didn't have his arms on the tiller at all. * * * Q. Didn't he make any change of course—sheer any? A. No, sir. * * * Q. How did he ever get over to the scow, do you know? A. How did he get to the scow? Q. Where was the scow—astern of the Henry S.? A. Astern of the Henry S. Beard. Q. Leading directly astern or to one side? A. Directly astern. Q. How did the Arrow get over there to strike it? A. He never changed; he kept right on straight. Q. Did he keep his hands folded that way all the time, to the time of the accident? A. Yes, sir. You know that boat can go along without being touched at all. Q. She can change her course without being touched? A. No; she strikes, and then she runs into Merchants' Stores. Q. Did you notice whether she kept her course or changed it—do you know? A. I didn't watch whether she changed her course or not; she came right up."

Henry R. Smith, once in the employ of the claimants, stated that he was on the end of the pier at the foot of Conover street, and gave this evidence:

"Q. What first attracted your attention to the Arrow? A. An alarm whistle blown by the tug Henry S. Beard. Q. Did you look to see what was coming? A. Yes. Q. And you saw the Arrow? A. I did. Q. Where was the Arrow—how far down was the Arrow? A. She was about between 200 and 300 feet apparently ahead of the two tugs with—as though to pass the tugs on the port side. * * * Q. Did you hear any one shouting? A. Yes, sir. Q. Do you know who shouted? A. I couldn't say who it was, but I heard it distinctly. Q. Did you hear from where you were standing any words? A. Any more than hollering, 'Keep off.' "

He states that the Arrow changed her course to the westward as she came head to head with the Edith Beard, so that by the time he struck the scows he had changed about three points. This is the witness who thought that the flood tide caught the Arrow's stern and swung her into the scow, and that if there had been no collision, and the Arrow had continued her course, she would have hit the end of Merchants' Stores, and that she was heading for Brooklyn at the time of the collision. Hurley, claimants' paymaster, testified that at the time of the collision the tugs were about off Conover street.

"When was your attention first called to the Arrow in any way that afternoon? A. I heard a lot of men on deck—several men—shouting, 'Here comes the Arrow;' and I looked around, and I saw the Arrow possibly a couple hundred feet ahead of me, or 200 or 300 feet—something like that. Q. That was the first you saw of the Arrow, was it? A. Yes, sir. Q. What was done on the tug in connection with seeing her? A. I heard the men shout, and I shouted myself. Q. Shouted what? A. 'Keep off! Look out!' and I waved a newspaper I had in my hand for them to keep off towards the shore, so we could get by all right."

He further states that he saw a man at the wheel on the Arrow, and then:

"Q. What was the man at the wheel doing as he came along by the tugs? A. He was looking over his left shoulder, and looking back at us. Q. Did you see him do anything with the wheel or make any motions of any kind? A. No, sir; I did not. * * * Q. Did the tug give any signal to the yacht? A. That I couldn't say positively. I heard him blow several blasts of the whistle; whether he was blowing to the yacht or not I couldn't say positively. Q. You mean before you saw her you heard blasts of the whistle? A. Yes, sir. Q. They were blowing them all the time for passing

vessels, weren't they? A. Yes. Q. After the yacht came up, and you sighted her, and they were calling to her, can you say whether the tug blew any whistles? A. I think there were some; I won't be positive."

It may be noticed that the masters of other vessels that passed during the day testified, and that some stated that signals were sounded to them by the tugs, and others testified that such signals were not given. Taking into consideration the entire testimony, it is probable that tugs did at some time blow an alarm signal to the Arrow, but not at so great a distance, as stated by Capt. Nevins and some other witnesses for the claimants. The rapidity with which the Arrow was going makes the ascertainment of the distance more difficult. But assume that they were blown when the Arrow was 500 or 1,000 feet away. What should the Arrow have done upon receiving an alarm whistle from tugs working forward? What should the master of the Arrow think they meant? What were they intended to mean? For some hours the tugs had been navigating, and claimed to have signaled other approaching craft. It appears that some vessels received the signal and some did not. None stopped, probably for the reason that they, especially the ferryboats, going and returning, saw the scow at the time rising from the water. But it is not understood that the signal was to make the opposite vessel stop. If the tugs relied upon a signal to warn approaching vessels, it should have been a signal whose purpose was or should have been known to the opposite vessel. If a vessel, whatever her relation to an approaching and opposite vessel, should stop whenever the latter sounds an alarm, then the Arrow should have stopped, and the tugs did all that was required. But the Arrow saw nothing ahead save the tugs; she was well off from them, and apparently could injure them only by her swell. Why, then, were the tugs authorized to expect that the alarm would stop the Arrow when the tugs themselves were working ahead, and no steering signals were given? Such a demand does not seem reasonable. Nor is it believed that the alarms were blown for such purpose, but rather to attract the attention of the Arrow to the tugs, in the hope that it would lead to the discovery of her submerged tow and the hawser leading thereto. The tugs were engaged in a work quite liable to do injury to other vessels. Any obstruction to navigation that is unusual is apt to prove injurious in a busy harbor. A sunken stationary vessel is recognized as dangerous, and must bear warnings by day and by night. If that same object be set in motion, its dangerous nature is not diminished. It becomes an ambulatory peril. Clamorous shouts and warnings and gesticulations to vessels well clear of the towing tugs, alarms that mean nothing when passing vessels are well clear of each other, are not sufficient. The manner employed to warn should have a meaning, either technical, or, in the nature of the case, necessarily understood. Precisely what it should be need not be decided; it is for those skilled in the art to determine it. Ordinary prudence demands that something appropriate be done or provided. It is impossible to escape the conclusion that the tugs were doing a dangerous thing; that their way of calling the attention to approaching and passing vessels to the capsized and aberrating scow was haphazard, unconventional, confusing, and quite as apt to lead astray as to instruct concerning the

danger. It is not strange that the captain of the Arrow looked at those on the tugs with continuing wonder or curiosity, and that his attention was diverted rather than directed towards the scow.

The damages and costs should be divided.