### THE SCOW NO. 51 H.

### THE OVERBROOK.

(District Court, E. D. New York. August 2, 1905.)

1. COLLISION—DRIFTING SCOW AND ANCHORED YACHT—INSUFFICIENT ANCHOR.

A dumping scow, which, with others, broke from a tow in New York Bay in the night, during a high wind, and drifted against and injured a yacht anchored near the eastern shore, *held* not in fault for the collision by reason of the absence of a chain or cable which prevented her anchor from being serviceable, on evidence which showed that the anchor, if it could have been used, would not have been sufficient to hold the scow or prevent the collision, on account of the high wind.

2. SAME—TOW BREAKING FROM FLOTILLA IN STORM—LIABILITY OF TUG FOR COLLISION.

While a tug with two helpers was in New York Bay in the night, with a tow of 21 boats, most of them loaded with coal, on the way from South Amboy to Jersey City, a heavy wind caused certain of the boats to break away, and one of them drifted against and injured libelant's yacht, which was anchored near the eastern shore. The evidence showed that the tow left the Kills about 12 o'clock, and that the wind was then light from the south or southeast, with no indications to give warning of the storm which struck the flotilla suddenly from the northwest at about 2 o'clock, or later, when it was in the vicinity of Governor's Island, the wind blowing from that time at a velocity of 48 miles an hour and upward until after the collision. Also that after it struck the tugs could not see the lights on the tows, and did not know that any had broken away until they reached Jersey City, and that, if they had known the fact, neither of them could have safely left the remaining boats to go to the relief of those adrift. *Held*, that on the facts the tug was not in fault for taking her tow out of the Kills, nor for failing to send relief to the drifting boats, and was not liable for the collision.

In Admiralty. Suit for collision.

Franklin Leonard, Jr. (Avery F. Cushman, of counsel), for libelants.

James J. Macklin, for the Scow No. 51 H.

Robinson, Biddle & Ward (Henry G. Ward, of counsel), for the Overbrook.

THOMAS, District Judge. The libelants' yacht Naushon was, on September 14th and 15th, anchored off Seventy-Seventh street, Bay Ridge, about 400 or 500 feet from the shore, where there were 12 feet of water at low tide. She was made fast to an anchored buoy inside the pier line, displayed an anchor light, and her master was aboard. Between 4 and 5 a. m. of September 15th, Scow 51 H, drifting from the northwest, with her captain and family on board, came down upon the yacht, and carried her ashore, doing the damage for which the libel is filed. This scow, light, with 22 other boats loaded with coal, was taken from South Amboy about 4:30 o'clock on the afternoon of September 14th. The scows were in tiers of three boats in a tier, No. 51 H being the outside starboard boat, and, on account of her length, made fast both to the last and next to the last tiers. The flotilla proceeded in tow of the tug Overbrook until the Baltimore & Ohio Bridge was reached, when two other tugs, the Media and Brinton, came to aid the passage through

the bridge and the further progress of the tow. After passing the bridge, the Media went forward, and put out a hawser to the head tier of the tow, and assisted the Overbrook in towing, while the Brinton took off two boats, and landed them in the Kills, one at Constable Hook and one at King's Plaster Works, New Brighton. Thereupon the Brinton pursued the tow, and joined it about 1:30 a. m. in the neighborhood of Robbins Reef, and aided thereafter in towing the flotilla to Jersey City. While in the bay a storm so affected the tow as to cause 14 of the boats, including Scow 51 H, to break loose and drift away. They continued to drift, under the influence of the northwest wind, breaking apart from each other from time to time. Some sank, some went ashore, and Scow 51 H brought up as already stated. Scow 51 H had a sufficient anchor, but no anchor chain or cable was supplied with it, and there never had been such on the scow. There were two or three good lines on the scow of about 30 fathoms in length, but too small to use with the anchor. The scow's hawser had been attached to another barge, which finally sank, but the hawser was not disengaged in time to allow the master of the scow to get it in and bend it to the anchor before the accident. The custom probably varies of dumpers carrying anchors and anchor chains and lines, but, considering the fact that such scows frequently break away from the tow, it seems negligent to allow a dumper to be used without a serviceable anchor, and certainly the anchor is of much less value if its use depends upon the employment of the hawser for the purpose of an anchor chain or cable.

The difficult question to decide is whether the anchor, if dropped, would have prevented the accident. The evidence must be read to understand what perilous conditions beset the drifting boats; what collisions, in the darkness and storm, they suffered or escaped; how, one by one, they sank, or went ashore; how the barge made fast to 51 H finally sank; and how the master of 51 H, having got loose from the sinking boat, and after long effort drawn in his hawser, was trying to bend it to the anchor, when he came suddenly upon the yacht. Had there been an appropriate anchor and chain or cable, he would have cast it. This shows that he at least hoped that it would be efficient to hold him against the northwest wind which was blowing between 4 and 5 o'clock at 48 miles per hour, and which at 4:15 blew for five minutes at the rate of 68 miles per hour. But should the court hold that there was a just foundation for the hope? The scow captain states that the anchor would not have held him. That evidence might be deemed interested, and hence less potent. But the evidence of the captain of the yacht, as a witness for his employers, the libelants, is as follows:

"Q. Do you think an anchor could hold that scow that night with the wind blowing as strong as it was? A. No, sir. Q. You don't think it could? A. No, sir. Q. Do you think it would be safe at all for a man to anchor such a scow? A. If he had plenty of cable he wouldn't have drifted so fast. Q. You don't mean to say it would stop her drifting that night, do you? A. If he had two anchors maybe it would hold. Q. Do you think one anchor would hold that scow with that ferocious wind on that night? A. No. * * * Q.

How can you tell whether that anchor, if thrown over, wouldn't have held her? How can you tell? A. Because it was too light for that. Q. The anchor was too light? A. Yes, sir. Q. But you think it would have stopped her drifting—made her drift slower? A. Yes, sir."

The court can judge of the probabilities only by the evidence, and when the two principal eyewitnesses of the accident, representing at the time the parties, advise that the anchor would not have been efficient to prevent the collision, their concurring conclusions cannot be disregarded. Hence the scow must be acquitted.

The libelants urge that the tug should not have gone out of the Kills, on account of the threatening weather, and also that it was in fault in not going itself or sending back one of the helping tugs to look after the safety of the tow after the storm broke. The duty of sending back a tug depends somewhat upon the location of the tow at the time the storm broke. The evidence of the tug is that the storm came suddenly, when the tow was either at Ft. William, Governor's Island, or in the vicinity of the new ground southerly of the island; and it is claimed by the tug that, had one of the helpers been sent back at that time, the other two tugs would not have been able to carry the tow forward, and that the flotilla would have been carried away by the storm. This suggestion is not fanciful, for in the combination of rain, darkness, the sudden shifting and violence of the wind, the conditions were peculiarly hazardous. It is satisfactorily established that, after the storm broke, the lights on the tow could not be seen, nor did the navigators have any knowledge that any of the tow had broken away until Jersey City was reached. Therefore, if the storm did strike the tow in the neighborhood of Governor's Island, as claimed, it was not neglect of duty that one of the tugs did not go back to see what the situation was. The first duty was to get the tow into a safe place. If the storm came upon the tow while it was in the neighborhood of Robbins Reef, one of the tugs could have gone back with greater safety. This necessitates a determination of the location of the tow when the storm broke upon her, which involves a careful examination of the history of the towing from the time the flotilla left South Amboy, and the same examination will aid the inquiry whether the tug was negligent in going out of the Kills at all.

The official record shows that on September 14th, from 12 m. to 1 p. m., the wind was east, with a velocity of 10 miles an hour; that between 1 and 2 the wind was south, with a velocity of 17 miles, which between 2 and 7 reached 17 miles, 23, 26, 22 miles, 25 miles, 24 miles, 14 miles, 15 miles; so that between 8 and 12 midnight the wind was south at 9 miles an hour. On September 15th, from 12 midnight to 1 a. m., the wind was southeast at 6 miles an hour, and so remained between 1 and 2, shifting meanwhile to the west. Between 2 and 3 o'clock the wind changed to the northwest, and blew 30 miles; between 3 and 4 it was north, and blew 51 miles; between 4 and 5 it was northwest, and blew 48 miles an hour, and thereafter decreased. At 4:15 a. m., for five minutes, the wind blew 68 miles an hour from the northwest. There had been rain, both light and heavy, between 12 m. and midnight of September

14th, with a heavy thunderstorm during the evening. On September 15th there was a very heavy rain from 3:05 to 4:45, with lighter intervening rains. If the tug had left the Kills before the wind changed in velocity from 6 miles, between 1 and 2, when it was westerly, to 30 miles an hour, from the northwest, between 2 and 3, it cannot be said that the navigators were negligent in going out of the Kills, unless there was something in the general weather appearance that should have given warning of danger to a person of such judgment and knowledge as the captain of the tug is expected to have. Although the night was dark, and there was some rain before 2 o'clock, it does not seem that there was anything to create reasonable apprehension of the violent storm that came thereafter. It is true that the newspapers published weather prophecies, but neither the direction nor violence of the storm was foretold. It appears that at Perth Amboy there is a station of the weather bureau, and that signals announcing a northeast storm were displayed there before the flotilla passed that point. But, notwithstanding the testimony of Koch and O'Leary, it is thought that the evidence shows that the flotilla passed Perth Amboy after dark, and that such signals were not seen. There was no such storm as the weather signals indicated. Ericson, the captain of Scow 51 H, states that the tow got into New York Bay at 12 o'clock midnight, when it was "kind of stormy, and blowing a pretty good stiff gale from the southwest. There was not such an awful sea on out there." He said he was not on deck on rounding Robbins Reef, but stayed below until he broke adrift, when the wind was in the northwest, and it blew harder and harder, and that he broke adrift about 2 a. m., and that at the time he saw the red lights of Governor's Island. It is about a mile between the mouth of the Kills and Robbins Reef. So, if the tow left the Kills at 12 o'clock, when the wind was six miles from the southeast, the storm did not break for two hours thereafter, which should have brought the tow into the position claimed by the tugs. The witness Muller and his wife, who were on one of the boats, did not add very much to the information as regards time. Mrs. Muller states that the tow left South Amboy about 3:30 p. m. Jacobson, who was on one of the boats in tow, states that the tow had left South Amboy between 3 and 4 p. m., and reached Shooter's Island about 12 midnight. Kerwin, the captain of the Philadelphia & Reading tug, stated that he was towing 14 loaded boats; that the weather was good until 2:30, when the storm broke; and that the weather looked threatening at 2 a. m., and there was very little sea at Robbins Reef. Maher, pilot of the Reading tug Ashburne, states that at 2:20 he encountered a storm at Robbins Reef. Hoagland, the captain of the Overbrook, testified that he had been towing for 40 years between South Amboy and New York; that he came on duty at 6 p. m.; that he went off duty at 12 o'clock, when the boat was just past Shooters Island, and that the weather was very calm at that time. Quinn, the pilot of the Overbrook, stated that the tow left South Amboy at 4:30, left the Kills about 20 minutes to 1 o'clock,

reached Robbins Reef about 1 o'clock, and that the storm came about 2:20 or 2:30. One Hemstreet, a witness for the scow, stated that he was the captain of the Genesee, which towed between Perth Amboy and New York; that he left Perth Amboy about 8 p. m., and did not notice any signals; that he passed Shooters Island at about 12 midnight, and at 1:30 stopped in the Kills; that it did not look very good for going out; that at 12 midnight the wind was quite strong, and that at 1:30 it was still on; that he tied up one or two miles from the mouth of the Kills. It seems that he left Perth Amboy a little late, and lost the flood tide; that he was accustomed to having a helper, and expected one, and it did not arrive; that he would not have bucked the ebb tide even if the weather had been clear. Knott, the captain of the Media, went on duty at 6 p. m., joined the tow at 10:45 at the Baltimore & Ohio Bridge, and went off duty at Shooters Island at 12 or 12:15. He testified that there was then no wind, and no indication of storm; that he was called out at 4:30 or 4:45, when the tow was opposite her dock at Jersey City. He did not notice the loss before arrival. Van Buren, the pilot of the Media, says that he came on duty at Shooters Island at 12:15; that a light breeze was then blowing; that about 2 o'clock they were near Governor's Island, with an ebb tide, when the storm struck them; and that there was no storm at Robbins Reef, where the tide was flood. He concurred in the testimony that after the storm broke the lights could not be seen. Scott, the captain of the Brinton, testified that he joined the tow at 11:10 and turned in at 1 p. m., when the Brinton was backing out of Constable Hook after dropping one of the boats there; that the tow was then out towards Robbins Reef; that Constable Hook was three-quarters of a mile from the mouth of the Kills, and that the weather was all right. Carolan, the pilot of the Brinton, states that he went on duty at 12 or 12:15, when the boat was landed at Constable Hook; that at 1:30 he joined the other tugs at Robbins Reef, when the tide was ebb, the distance from Bergen Point to Robbins Reef being one and a half to two miles; that in the meantime there was no sea and a light wind; that at 2:30 the tow was abreast of Ft. William, when the storm came; that he did not see any lights on the tow, although he looked around; that there was a deck hand in the pilot house, in and out, and that he was on lookout, except for a short time he was below.

The evidence carries conviction that the tow was not imprudent in going out of the Kills. He would be a feeble and unserviceable navigator who should hesitate to attempt passage of the bay with the wind blowing six miles an hour, although atmospheric conditions might be unfavorable. But it does not appear that even scientists expected the storm, nor is there reason for criticising the sturdy masters and pilots of the tugs for a failure in that regard. It is also considered that the evidence shows that the flotilla was well towards Governor's Island when the storm came. The sudden change of wind, with the greatly increased velocity, made it necessary for the tugs to devote all their power to carrying the tow

into a safe place. If in the crisis the Overbrook, or any of the tugs, had gone back to patrol, and the flotilla had been carried either upon Governor's Island or the adjacent works, criticism would have been sharp and condemnatory. Even had a tug gone back after the storm broke in its fury, it is very doubtful whether it could have aided the tow; and after the boats broke away, while the tug might have secured a single barge, it could not have done more. It owed no more duty to Scow 51 H than to many other boats that were adrift. Had not the storm come quickly and demanded all the towing power of the tugs, the claim would be reasonable that one of them should have gone back to see whether all was well, and, if conditions permitted, made fast, and, by pushing on the last tier, diminished the strain on the lines by which the boats were held together. But the more this storm is studied, the more apparent will it be that the earlier unfavorable weather of the 14th had lapsed into a state that induced vessels to leave their moorings, and that thereafter a sudden violent wind springing up from an unexpected direction entrapped those who had trusted to the apparently favorable conditions.

Pursuant to these views, the libel must be dismissed.