## THE HERCULES. THE J. G. ROSE. NEW YORK, O. & W. RY. CO. v. COR-NELL STEAMBOAT CO. et al.

(Circuit Court of Appeals, Second Circuit. April 3, 1922.)

No. 254.

Towage ⬅️15(2)—Evidence held insufficient to impute negligence to tugs for loss of tow.

Evidence *held* insufficient to impute negligence to tugs in losing a boat in a tow of 18 boats which were being brought down the Hudson river in a storm.

Appeal from the District Court of the United States for the Southern District of New York.

Libel in admiralty by the New York, Ontario & Western Railway Company against the steam tugs Hercules and J. G. Rose, their engines, etc.; the Cornell Steamboat Company, claimant. Decree for libelant, and claimant appeals. Reversed, with instructions to dismiss libel.

On October 24, 1917, libelant's coal box No. 22 was on the port side of the last tier of a hawser tow of 18 boats which was being brought down the Hudson river from Newburgh by the main tug Hercules and the helper tug J. G. Rose. Some time after 1 p. m. of the same day the tow, while proceeding down through Haverstraw Bay, ran into a storm. All the tow got through in good order, except the No. 22, which, loaded down to only about one foot freeboard and with no hatch covers, turned over and dumped her cargo. At the time of this occurrence, the J. G. Rose was away from the tug, having put into Haverstraw to pick up some loaded brick barges which were to be added to the tow.

The principal ground upon which libelant had his decree was that the District Court was of opinion that the J. G. Rose should have gone back to the assistance of the tow before she steamed off for Haverstraw, and that, had the No. 22 been shifted to the starboard side of the tow, or had a light barge, brick scow, or larger craft been placed on her port, she would have come through successfully. The navigators were men of long experience in this class of work on the Hudson—Walker, master of the Hercules, 30 to 35 years; Lanfare, the pilot, 35 to 40 years; Hickey, the master of the J. G. Rose, about 30 years; and Grimes, the pilot, 10 years. The tow was properly made up at Cornwall, in about 6 tiers, the tugs using hawsers about 90 fathoms long.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, of New York City, of counsel), for appellant.

Alexander & Ash, of New York City (Peter Alexander, of New York City, of counsel), for appellee.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge. We think the sole question in the case is whether the navigator—i. e., the master in command of the Hercules—was justified in continuing across Haverstraw Bay. There is no question as to the propriety of starting out from Cornwall. It is not doubted that a tow proceeding down through the Highlands would be sheltered, and we think it plain that even though, on rounding Verplank's Point into the upper entrance of Haverstraw Bay, there might be a wind and some rough water in the bay, it would not be possible

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

for a navigator to observe the actual conditions in the bay until he got into it. If, then, the weather was severe, the only safe course would be to continue ahead, holding the tow directly into the seas, for to attempt to turn the tow would bring it into the trough of the seas and expose it to great danger. Lanfare held the tow right into the wind and sea, and his navigation in that respect is free from criticism.

Mr. Scarr, of the Weather Bureau, testified from the records taken at New York and Rhinebeck that the storm was moving to the northward with a velocity of between 40 and 50 miles (51 in New York City at the highest), and that, in his opinion, the maximum wind was probably reached at Cornwall after noon, "somewhere between 2 and 3 p. m."; that is, long after the tugs and tow left Cornwall. Between Cornwall and Haverstraw Bay there are not any stations at which storm warnings are displayed, and Walker and the other navigators did not know, nor was there anything to inform them, that a general storm was moving up from the south. It is clearly established that the wind increased somewhat after the tow got out into Haverstraw Bay.

Without reciting further details, we think the evidence clearly establishes that the master and his associates had no reason to expect a storm of any consequence, and, indeed, it may be questioned whether the storm in the vicinity of the locus in quo was in any sense serious, when it is noted that according to Scarr "the maximum wind at Rhinebeck was only 36 miles an hour, and after it occurred at 4:45 p. m. it eased off very quickly and became light." The case is very much like The Victoria, 95 Fed. 184, 37 C. C. A. 40, both as to circumstances and locality, except that in the Victoria, the storm was more severe, and there were 28 boats in charge of three tugs.

Curiously, also, Walker of the Hercules, had been captain of the Victoria, and he testified that the storm in the Victoria Case was much worse than that here concerned. The very full and analytical discussion in The Victoria, with its perfect understanding of that part of the Hudson, renders further description by us unnecessary; also, under the authority of that case, as well as in our independent view upon the facts in this case, it is plain that there was no duty on the part of the navigator to use the helper tug as a sort of scout or guardian to place the No. 22 in some other position. We are unable to find any ground upon which negligence can be imputed against the tugs.

The decree is reversed, with costs, and the District Court instructed to dismiss the libel with costs.