## THE MARY T. TRACY.

## THE WALTER TRACY.

(Circuit Court of Appeals, Second Circuit. May 11, 1925.)

No. 327.

**1. Collision ⟨⟩22—Evidence held to show that collision of tow with steamship was due to inevitable accident, relieving tugs from liability.**

Evidence showing tugs possessed sufficient power to command and navigate tow when it started, and that collision of tow with steamship was due to unusual and unexpected conditions of wind and tide, *held* to support defense of inevitable accident, and excused tugs from claim of fault under vis major rule.

**2. Collision ⟨⟩61—Tug having sufficient power at start is not chargeable with fault or negligence, where loss results from unusual weather conditions encountered.**

Tug, having sufficient power to command and navigate tow when it starts out, may not be charged with fault or negligence, where loss results from unusual conditions of wind and tide encountered.

**3. Collision ⟨⟩71 (3)—Steamships projecting into channel not liable for loss from collision with barges in tow, brought about through vis major.**

Where collision between barges in tow and steamships projecting into channel was due to unusual and unexpected conditions of wind and tide, taking barges beyond tug's control, steamships were not liable for resulting loss because of their projection into channel.

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the libel and petition of Thomas Tracy, as owner, and the Tracy Towing Line, Inc., as charterer, of the steam tugs Mary T. Tracy and Walter Tracy, their engines, etc., for limitation of liability. From a decree (298 F. 528) granting the exemption, etc., the Dampskibsselskabet Norden Akties, claimant, appeals. Decree reversed.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, L. De Grove Potter, and Alvah H. Combs, all of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Thomas H. Middleton, both of New York City, of counsel), for appellee steamship Arkansas.

Macklin, Brown & Van Wyck, of New York City (Horace L. Cheyney, of New York City, of counsel), for claimants-appellees O'Boyle and M. & J. Tracy.

Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for petitioners-appellees.

Before HOUGH, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. On January 24, 1919, at about 2:45 a. m., the barge Powerful, in tow of the Mary T. Tracy and Walter Tracy, came in collision with the stern of the steamship Finsen, then moored on the westerly side of the National Dry Dock pier at Port Richmond, Staten Island. The tugs had in tow 16 loaded boats. The Mary T. Tracy was 95 feet long, 24 feet beam, and 375 horse power. The Walter Tracy was 175 horse power. The tugs thus had a combined horse power of 550, which was ample. The boats were 120 feet long and placed four abreast in the first tier; the second and third tiers were also four boats, and the fourth tier three boats, while a single boat tailed astern. The tow had two hawsers, 275 feet long, which were fastened to the Mary T. Tracy. The helper tug, Walter Tracy, was made fast to the port side of the Mary T. Tracy, with no line to the tow. The reason for the helper tug's position was said to be to use the towing power of both tugs, but in case occasion demanded to send the helper tug astern; she could drop off quickly, without having to take in a hawser to the tow.

The boats in tow were deeply laden, with little freeboard, and varied in draft from 12 to 17 feet. They were thus subject to the effect of the tide, as well as the wind. The tow started from Arlington, N. J., bound for New York. The Powerful was the starboard barge of the second tier. The Arkansas lay alongside the Finsen at the pier. Both steamers projected into the channel way, and, it is claimed, without lights visible to boats coming from the west and bound east. While the tow was navigating through the channel bound east, with a violent northwest windstorm raging, with a velocity of 65 miles an hour, the barge Powerful struck the Finsen's stern with sufficient force to break up the tow and swing it in shore to the stern barge, causing the Trinity to sink, and with considerable damage to the Finsen and Arkansas, both of which were driven in shore. The Finsen and the Powerful sustained serious damage.

It is demonstrated satisfactorily that weather conditions warranted the captain of the Tracy starting when he did; also that the tugs were capable of managing the tow under the then weather conditions. It was found below, and we approve the finding, that there was a change in the weather conditions, and the tow encountered this severe storm and change of tide at the points testified to by the captain of the Tracy. It is also sufficiently established that the tow was properly made up and that the tugs were fastened in accordance with good maritime practice. When the tow left Arlington, N. J., the tide was flood. It proceeded across to the westward of Shooter's Island, and when near the island the breeze freshened a little bit. There it was shielded between Shooter's Island and Mariner's Harbor. Nothing unusual occurred until it got across Newark Bay. While crossing Newark Bay, the wind was from the northwest and it was blowing very hard. It came up suddenly and without warning. The tide had started to run ebb, and at the time slackwater or just a little running in was to be expected, according to the calendar. This unexpected condition is accounted for by the strong northwest wind driving the water out of Newark Bay.

Passing the lee of Shooter's Island, the full force of the wind blowing from the open reaches of Newark Bay struck the flotilla, and drove it out of the bay and down by Bergen's Point light. Thereupon the captain continued his way, heading toward the New Jersey shore. Then the wind struck the tow broadside, and this, with the ebb tide, drove the tow toward Staten Island. There both forces were sufficient to set the tow on the National Dry Dock pier. At this point the channel is about 1,000 feet wide. The captain of the Tracy had no place to put in

or tie up to, west of Port Johnson stakes. The flotilla could not get into Mariner's Harbor because of its draft; they would lie aground and would block the channel. Along Shooter's Island there are shoal spots, and the tow could not have tied up there, for the reason, as stated, that "unless you throw them up on the beach behind Shooter's Island; that is the only place, and you would have to get a mud digger to dig them out." Another tug with a large tow passed at 11:45 p. m. The fog had cleared up then, and, the weather being fit, he came across Newark Bay about 2:15 a. m., when the blow started, and the wind increased greatly after that. This flotilla passed 200 feet off, and the captain says that he could not manage his tow, and it went all over the channel. Similar reports of inability to manage their tows were given by other members of crews who were in these waters at the time of the storm.

The weather forecaster testified that there was a storm on January 23d moving across Indiana and heading east toward New York; that there was a fog on the 23d, and rain most of the day; that at 3 p. m. a southwest storm warning was sent out from Washington, D. C., and was received at 4:25 at the Weather Bureau station in New York. In New York, however, the wind did not blow from the southwest, because the wind blows toward the storm center, which was a little south of New York, so that it was a northwest storm. The fog ended at 10:30 p. m. on the 23d, but the rain continued. It was cloudy all night. Between 10 and 11 p. m. the wind was from the north, with a velocity of 15 miles per hour, and between 11 p. m. and midnight it was from the north and blew 24 miles an hour. The maximum of velocity at 3 a. m. was 65 miles an hour. Capt. Brown, of the Mary T. Tracy, testified that it would have been of no avail to have sent the helper tug to push the tow, and that "I don't believe that six tugs could hold them off; they might do it ahead, but they would not do it on the outside of the tow." He regarded the power of both tugs ahead as the best way to utilize it.

[1] This sudden change of the wind with increased velocity and the force of the tide, unexpected as it was, sufficiently accounts for the collision. It supports the defense of inevitable accident. Even though the tug had gone back after the storm broke, it could not have aided the tow more than it did in the position it assumed. All the horse power which was employed at the start was efficiently utilized, and it could not withstand the severity of the wind and tide. Under these

conditions, the conclusion is irresistible that the tugs should be excused from the claim of fault because of the vis major rule. The Hercules (C. C. A.) 282 F. 615; Scow No. 51 (D. C.) 140 F. 70; The Cornell, 134 F. 649.

[2] Fault or negligence may not be charged to a tug where it had sufficient power to command and navigate a tow when it started out, and especially where it encounters such unusual conditions as occurred on this journey, even though loss resulted. The Bulley (C. C. A.) 266 F. 31. It will not do to criticize the conduct of Capt. Brown in the crisis which confronted him, since he demonstrated the exercise of prudent conduct, when tested by the care and caution expected of navigators in the exercise of reasonable care. The Battler, 72 F. 541, 19 C. C. A. 6; The Garden City, 127 F. 298, 62 C. C. A. 182.

[3] Since the collision was brought about through vis major, no liability will attach to the Finsen or the Arkansas for their projection into the channel.

The petition for exemption from liability should have been granted as to both tugs.

Decree reversed.