### THE ELIZABETH EDWARDS.

Circuit Court of Appeals, Second Circuit.
July 2, 1928.

No. 292.

Shipping ⊛⟶140(1)—Agreement between master of private vessel and shipper for shipment at owner's risk precluded liability of ship for damage to cargo (Harter Act [46 USCA §§ 190–195]).

Agreement between master of private vessel and shipper that shipment of cargo should be at owner's risk held to preclude liability of carrier for resulting loss; such agreement being lawful, within the Harter Act (46 USCA §§ 190–195), relation between shipper and ship in such case being that of bailor and bailee.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Fidelity Phenix Fire Insurance Company, as underwriter of the Triton Oil & Fertilizer Company, against the motor vessel Elizabeth Edwards, claimed by Edwards Bros. & Co., Inc., to recover by right of subrogation for damage to cargo of nitrate of soda carried by the Elizabeth Edwards from New York to Promised Land, Long Island. Decree of dismissal, and libelant appeals. Affirmed.

Bigham, Englar & Jones, of New York City (Henry N. Longley and Alfred Ogden, both of New York City, of counsel), for appellant.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge. By oral agreement between Mr. Morse, the president of the Triton Company, and Captain Edwards, for the owner of the Elizabeth Edwards, it was arranged that the vessel should be furnished for carriage of the cargo in question, but that she should have nothing whatever to do with the loading. She is a very staunch fishing vessel, and during the menhaden season she was under contract to sell and deliver her fish to the Triton Company. She has never been in the cargo-carrying business, but on several occasions has transported materials for the Triton Company, accepting as freight whatever Mr. Morse thought fair to pay. After the close of the menhaden season, in 1924, Mr. Morse notified Captain Edwards that he was expecting the arrival in New York of 112 tons of nitrate of soda, which he would like to have brought to the factory at Promised Land by the Elizabeth Edwards. By telephone Captain Edwards replied that his crew had been discharged, but he was ready to present his boat for the shipper to load, making the oral agreement above referred to.

Pursuant thereto Captain E. J. Edwards, his brother, H. N. Edwards, and the boat's engineer took her to Fulton Street dock on October 29, 1924, where they met Mr. Patterson, of the Triton Company. He directed them to proceed alongside the steamship Essequibo, and he arranged with the ship's stevedores to load and stow the cargo on the Elizabeth Edwards. When her fish hold was filled to the top of the hatch coaming, the loading stopped. Mr. Patterson then went away to telephone for instructions, and on his return stated that Mr. Morse wanted ad-

ditional cargo taken. Captain Edwards' testimony is that he replied: "Well, I would risk the boat." H. N. Edwards testified that the captain said: "We will risk the boat, if you want to risk the cargo." On cross-examination, he admitted he was not entirely sure that the words about risking cargo were used; but there was no contradiction of his testimony, and the court found that the understanding between Captain Edwards and Mr. Patterson was in accordance with the conversation as H. N. Edwards gave it. Some 10 or 15 additional tons were then loaded by piling the bags of fertilizer upon the hatch coaming to a height of about four feet. Tarpaulins were then lashed over the pile. While proceeding through Long Island Sound the vessel encountered short, heavy seas, which caused her to pitch and roll, and this, coupled with the weight of the bags upon the hatch coamings, worked loose the oakum in one seam on each side of the vessel's deck, next to the covering board. Water coming over the deck leaked through these seams into the hold and caused the cargo damage sued for.

There is no doubt whatever that the vessel was seaworthy, except in so far as the manner of stowage endangered her deck seams. The libelant relies upon the implied warranty of seaworthiness for the particular voyage and cargo, and asserts that this was broken by the master in allowing the cargo to be stowed in such a way as to cause leaking deck seams in weather which was not unusual. The Edwin I. Morrison, 153 U. S. 199, 210, 14 S. Ct. 823, 38 L. Ed. 688; Olsen v. U. S. Shipping Co., 213 F. 18 (C. C. A. 2). But there is a finding by the trial judge that he believed the master's version of the transaction, supplemented by that of his brother, to the effect that it was agreed that the additional cargo should be taken at the risk of the shipper. This was a lawful agreement, so far as the Harter Act (46 USCA §§ 190–195) is concerned, because concededly the vessel was a private, not a common, carrier, and the relation between shipper and ship was that of bailor and bailee. The Fri, 154 F. 333, 338 (C. C. A. 2); The G. R. Crowe, 294 F. 506 (C. C. A. 2). Even in the absence of such a specific agreement it may perhaps be doubted whether the ship would be responsible for damage caused solely by bad stowage by the shipper's stevedores. See The Thomas P. Beal, 11 F.(2d) 49, 52 (C. C. A. 3); The Oakley C. Curtis, 4 F.(2d) 979, 981 (C. C. A. 2). But we prefer to rest our decision upon the court's finding, for which there is warrant in the evidence, that the shipper agreed to take the risk.

The decree is affirmed, with costs.