## THE TERNE.

## DYAL PRODUCE CORPORATION v. MUNSON S. S. LINE.

### No. 11312.

District Court, E. D. New York.

May 23, 1932.

See, also, 60 F.(2d) 667.

Hunt, Hill & Betts, of New York City (Robert McLeod Jackson, of New York City, of counsel), for libelant Dyal Produce Corporation.

Irving L. Evans, of New York City (Irving L. Evans and John T. Carpenter, both of New York City, of counsel), for Munson S. S. Line.

Haight, Smith, Griffin & Deming, of New York City (H. M. Hewitt and Arnold W. Knauth, both of New York City, of counsel), for owners of the Terne.

INCH, District Judge.

Libelant claims that it has been damaged by the negligent stowage of a cargo of its potatoes, also by the deviation of the steamship Terne, chartered by libelant from the respondent for the purpose of transporting these potatoes from Georgetown, Prince Edward Island, to Cuba, the steamship being owned by the claimant, Bergen Lloyd, and finally by a failure to deliver said potatoes at Cuba before the market price for such merchandise had declined.

Libelant has sued the respondent in personam and the steamship Terne in rem.

█ The obligations resting on respondent and the ship differed. The Elizabeth Edwards (C. C. A.) 27 F.(2d) 747; Oxford Paper Co. v. The Nidarholm, 282 U. S. 681–685, 51 S. Ct. 266, 75 L. Ed. 614; Knohr, etc., v. Pacific, etc., Co. (D. C.) 181 F. 856; The Freeman v. Buckingham, 59 U. S. (18 How.) 182, 15 L. Ed. 341; The Capitaine Faure (C. C. A.) 10 F.(2d) 950.

However, the issues raised by the answers to the amended libel can be disposed of in a single opinion.

█ It would also seem to me that on this record according, of course, as to what facts were found, the libel could be dismissed as against the ship, yet a decree directed against respondent. Thomas P. Beal (C. C. A.) 11 F.(2d) 49.

A large amount of testimony has been taken, both by way of deposition and the production of witnesses at the trial. Briefs submitted by counsel for each of the parties have been both exhaustive and exceedingly helpful in considering all this testimony. The important issues are largely those of fact, and many of these facts are not in real dispute.

These material facts I find to be as follows, and for convenience I shall refer to the libelant as Dyal, the respondent as Munson, and the claimant as the Terne:

The claim of Dyal that the Terne was unseaworthy because of the absence of an ice pilot was withdrawn in open court.

The Terne is a small cargo steamer, built for the Baltic trade, with her hull specially strengthened at the bow to enable her to navigate against the ice. She had two holds. The forward hold was 90 feet long, the aft hold 82 feet. Each of these holds had two hatches Nos. 1, 2, 3, and 4 commencing at the bow. Her boilers and engines were amidships.

So far as I can see, and I so find, she was entirely seaworthy as to equipment and ability to carry these potatoes from Georgetown to Cuba. Her captain was long experienced in this sort of work in the ice, and I can find no criticism of her crew.

Munson had chartered the Terne from claimant by the ordinary government form "Produce Exchange" time charter. This contained the usual Harter Act clause and exceptions (46 USCA §§ 190–195).

Dyal was in the potato business, buying from or through the Potato Growers' Association. It was engaged in buying and selling large quantities of potatoes.

On January 7, 1929, Dyal negotiated a subcharter of this ship Terne from Munson. This subcharter chartered the whole of the ship, and contained the usual clauses as to her seaworthiness, and therein Dyal agreed to furnish a minimum cargo of 10,000 bags of potatoes of 180 pounds each, or the equivalent thereof, which would be 20,000 bags of 90 pounds each, and to have the option of increasing this quantity. The bags placed on board at Georgetown the port of loading were 90 pound bags. So far as I can see, there is no claim made that the rate charged was high or unusual. There were no special clauses in the contract as to any exceptional care to be taken of the potatoes. The compensation of Munson was for a lump sum prepaid freight.

The Terne could accommodate 35,000 90-pound bags. This subcharter, therefore, was the ordinary "Munson Voyage" form of charter, and provided bills of lading on the ordinary "Munson Line" form.

All these documents contained the usual Harter Act clause and exceptions.

Dyal had shipped about a dozen of such shiploads by other ships from this same vicinity during the months previous, and had started its negotiations for this particular subcharter several weeks prior to January 7, 1929.

January 7 was an exceedingly late date for such work, as the waters around Georgetown and vicinity were then quite often frozen, and navigation interrupted in part or for a considerable period, by reason of blizzards, northwest gales, etc.

The Canadian government icebreaker Stanley was in constant use.

All of these conditions were well known not only to Munson but to Dyal.

However, Dyal was so anxious to get this shipload of potatoes from Georgetown to Cuba that it had subchartered the Terne, and Munson had agreed thereto.

The day before this subcharter was signed, the Terne was carrying a load of coal at Corner Brook, Newfoundland. While she was discharging there, that harbor froze, but she made her way out without trouble, under her own power, and reached Georgetown about noon, January 9, 1929, ready to load the potatoes.

The Terne, in coming from Corner Brook, Newfoundland, to Georgetown, had come across Cabot Strait and along the western shore of Cape Breton Island. This was the reverse of the course, which, 12 days later, she tried to take bearing the potatoes of Dyal. During this trip her experienced captain had opportunity to and did observe conditions, and he saw that certain lighthouses along that course had been extinguished for the winter, but that the light at the point of Prince Edward Island was burning.

The subcharter between Dyal and Munson also provided, among other things, that it was subject to "ice conditions" permitting the steamer to load (part of clause 4), and that "lay days, if required, were not to commence before January 14, 1929." The privilege was given to Dyal to cancel should the Terne not be at the loading port ready for cargo January 15, 1929 (clause 13).

As we have stated, the Terne was at the loading port on January 9.

I do not consider that it is important on the facts here whether other vessels were loaded prior to the Terne, for there is no proof that there was any damage to the potatoes done at Georgetown, and Dyal's potatoes had not all arrived at that time.

The proof is that such potatoes received their damage on the voyage from Georgetown.

The day following the arrival of the Terne, January 10, as well as those of January 14, 15, 16, and 17, were too cold for safe loading of potatoes. Dyal's potatoes were not all ready and present at Georgetown even during those days. However, the 11th, 12th, and 13th of January had been safe for loading potatoes, and two other ships were loaded with such cargo, but the Terne could not have departed on any of these days, for the reason that Dyal did not have the cargo present.

On January 10, 1929, Dyal, by its representative Thompson, sent a letter to the Potato Growers' Association apparently for the agents of Munson at Georgetown in regard to some 14,000 bags of potatoes for the Terne, in which letter it is stated that the holds (Terne) should be preheated and sufficient dunnage be placed around the sides of the holds to keep the potatoes away from the steel structure; that this would be an added protection should the cold penetrate through the holds.

Weather conditions moderated somewhat during the afternoon of January 15, for sailing purposes at least, and early on the morning of January 16 these two vessels that have been mentioned left with their cargo of potatoes. During that day they passed successfully through the Gut of Canso, into the Atlantic Ocean, and naturally the master of the Terne, lying at the pier awaiting Dyal's cargo, had been anxious about the delay, and had sent a telegram to Munson indicating his idea that he should get away as soon as possible.

Munson notified Dyal of this, yet Dyal urged Munson to hold the Terne. Munson complied.

In addition, the master of one of these vessels, that had sailed successfully on the 16th, after passing through the Gut of Canso, notified the master of the Terne, by radio, that they had gotten through all right. This was received the evening of January 16.

The weather having moderated somewhat, as I have said, preparations were made by Munson's representatives at Georgetown, and the master of the Terne, to load such potatoes of Dyal's as were available, and charcoal stoves, furnished by the railway, such as were used in railway cars, were placed in the holds of the Terne to preheat the same, and on the evening of January 17, the wooden dunnage and straw was slung over the sides and into the holds and the holds were made ready for the safe stowage of the potatoes.

The following morning, January 18, the stevedores commenced work at 8 o'clock, and proceeded to load into the Terne all the potatoes of Dyal's then available. This work continued until 4 o'clock in the afternoon, when it ended, as there were no more potatoes to load. During this time 11,649 bags were loaded.

The representatives of Munson, telegraphed on this day, January 18, about 5 o'clock, to Munson stating that the weather was very mild, and regretting that they could

not have completed the loading because Dyal's potatoes had not all arrived, as this could have been done by 10 o'clock that night.

It is thus significant and most important to state that, if the balance of Dyal's potatoes had then been present at Georgetown, this work could have continued, and by 10 o'clock that night, or approximately that time, the Terne would have been in condition to sail, and she could have sailed the next morning the 19th, twenty-four hours before she actually was able to leave. She would then in all probability have been able to have followed the other ships safely through the Gut of Canso and avoided the northwest storm which did not arise until later, in the afternoon of January 20th.

However, she could not so leave. Apparently representatives of Dyal were having trouble with getting all their potatoes to Georgetown, and accordingly the Terne was compelled to remain at her pier all of the next day and until the evening of Saturday, January 19, when two trains came in bearing the balance of Dyal's potatoes. These potatoes were then immediately loaded into the Terne, directly from the cars. A gang of stevedores of 76 men started to work about 7 o'clock that evening, and worked steadily until 2 o'clock in the morning, at which time the work was completed and the Terne made ready to sail. The total number of bags of Dyal's then in the Terne was 18,400, 90 pounds each, which was 1,600 bags short of the 20,000 bags, stipulated in the subcharter between Dyal and Munson. This shortage might cost Dyal money, a fact as to which it was undoubtedly aware, and which is not to be lost sight of in discussing subsequent events.

Everything being at last ready, the Terne early that morning of January 20 steamed out into the harbor. The temperature was in the neighborhood of 37 degrees; there were no storm warnings. Her master had, as we have seen, received word that the other vessels had shortly before gotten safely through the Gut of Canso. He knew this to be by far the best and safest course to the open sea, unless the ice should close the Gut. About 10 o'clock, after he had gone about 26 miles, he encountered ice to such an extent that it was deemed unsafe by him to proceed, and, in fact, impossible for him to further attempt proceeding on this course.

Accordingly, as he saw that the water appeared clear to the north, he did the next best thing, and altered the ship's course, with the intention of proceeding to the ocean, by way of Cabot Strait. For a while this was successful, but a northwest gale arose, and by 9 o'clock that night he again encountered such ice as to entirely prevent progress in this direction.

In this emergency he decided to turn completely around and go back, but by the time this could be done the Terne was trapped in the ice, which piled up around her in places 20 feet thick. The Terne thereafter was at the mercy of this ice, and drifted with it within a mile of the shore. There she remained approximately 17½ days, from January 21, to February 8, in spite of anything that could be done.

The master of the Terne, in this predicament, for a while kept up full steam. As the days went by, in order to conserve his coal, he shut down one boiler. All the hatches and ventilators were kept tightly covered so as to confine what heat there was in the ship. The temperature meanwhile outside was extremely cold, with high northwest and west winds.

The government ice breaker Stanley attempted to go to the rescue of the Terne, first by trying to get across George's Bay, but, this failing, the Stanley went around the ocean side of Cape Breton Island, and started for the Terne by way of Cabot Strait. Ordinarily with open water she would have reached the Terne in half a day, but, on account of the ice, it took her 3 days, and, when she finally reached the Terne, she too became frozen in, so that both of these vessels remained approximately side by side in the ice for 5 days.

Finally, and on February 8 a south wind blew for the first time since January 20. This soon loosened the ice, the Terne and the Stanley were released, the latter gave a tow line to the former and both proceeded to Sidney.

This in substance, was the experience that the Terne went through and the bitter cold that her cargo was exposed to.

It would seem to be indicated from the argument of counsel for Dyal that comparatively but a small amount of the potatoes were damaged by the cold, thus indicating that such damage was due solely to improper stowage, to wit, the lack of sufficient wooden dunnage.

However, it seems to me, that the facts show that a comparatively large amount of the potatoes were frozen principally in the bow and the stern of the vessel and along her sides, indicating, if anything, an ex-

posure of many bags to the bitter cold that the ship experienced.

The remaining two thirds of the cargo stowed at Georgetown were never disturbed, and were safely delivered at Cuba in a sound and healthy condition.

Dyal had a representative at Georgetown, a Mr. Macfarlane, the assistant to Mr. Boulter who was to look after this matter for Dyal but had gone elsewhere and designated Macfarlane and Dyal had sent a telegram to Munson "to please work with Macfarlane." Macfarlane was an experienced man, but Dyal did not call him as a witness, nor was his deposition taken.

While the Terne was in the ice, it appears that Dyal reasonably felt that these potatoes might have been affected by the severe cold, as it was well aware of the conditions at Georgetown and the nature of the voyage, and accordingly felt it would probably be necessary to eliminate the frozen potatoes from the rest of the cargo both because of the danger that such potatoes would cause to the remainder and the requirements at Cuba when the cargo was ultimately landed there.

Dyal suggested, therefore, that an examination be allowed to its representatives at Sidney, and that, if this examination confirmed its fears, the Terne be diverted to a port for the purpose of reconditioning the cargo, and agreed that it would pay the expenses of such diversion.

There were two ports available for this purpose. One was Halifax, which was only about a day's voyage from Sidney and was directly on the course to Cuba. The other was St. John which was 3 or 4 days out of this course, up the Bay of Fundy.

Dyal chose St. John for the very apparent reasons that it not only desired this reconditioning of the cargo, but that it had an additional amount of potatoes at this port, which it wanted the Terne to carry, thus not only relieving it of the shortage of cargo of 1,600 bags which had existed in the original cargo at Georgetown, but would also increase the amount of potatoes it could later sell at Cuba.

Munson, on this promise, agreed to thus send the Terne to St. John, and she, after making certain repairs at Sidney, made necessary by the experience she had been through, and all of which appear to have been absolutely proper, including bunkering, went to St. John, and a further examination was there made of her cargo. 6,519 bags were taken out, and of these 772 were found to be unaffected by frost. The balance had

potatoes frozen in whole or in part, and 1,600 bags of these were reconditioned and restowed, 4,000 bags were sold at St. John, and 67 were totally unfit, as the potatoes had melted. In addition, Dyal loaded on board an additional cargo of some 6,000 bags of potatoes which it had waiting at St. John, extra dunnage was provided, not only to accommodate the new cargo, but, in my opinion, also to take the place of the dunnage which had been rendered useless or dangerous by the frost and subsequent wetting which it had gone through. Finally, the Terne without unnecessary delay sailed for Cuba with the 25,000 bags, instead of the 18,400 bags originally stowed, and reached Cuba without further incident, and delivered its cargo in good order and sound condition.

This voyage from Georgetown to Cuba ordinarily would have taken approximately a week and one-half to 2 weeks. As it was, it commenced at Georgetown, as we have seen, on January 20, and ended at Cuba on or about March 4.

This delay is now blamed by Dyal entirely upon the Munson and the Terne. Dyal likewise claims that the market for potatoes at Cuba had in the meantime declined and it suffered loss from this delay.

There are three essential matters to be determined: First, the claim that the potatoes were negligently and improperly stowed at Georgetown, and that this caused them to be affected by the cold; second, that the master of the Terne was negligent in his navigation of the Terne; third, that the expenses of the deviation, which had been paid by Dyal, under what it claims was duress, at Cuba, before Munson would release the cargo, should now be returned to Dyal, together with its damages for the delay in reaching Cuba.

I have carefully considered all the testimony, and fully appreciate the limitations of deposition testimony on which, to a considerable extent, Dyal had to rely at the trial. It, however, seems to me, after fairly considering all the witnesses to the stowage of these potatoes at Georgetown, that the preponderance of credible proof indicates that the potatoes were stowed at Georgetown in the ordinary and usual manner and with all the safeguards against frost which could reasonably be anticipated at that time in a voyage from Georgetown to Cuba.

I have not overlooked the fact that this loading of the Terne, as well as of the two other vessels which left a day or so before, took place at the extreme end of the season

for such work, if not a little beyond it, and that, therefore, ice conditions of a severe nature were to be anticipated. I find nothing to indicate that it could reasonably be supposed, at that time, that the Terne would be caught in the ice and remain helpless in that condition for 17½ days. Nor can I overlook the fact that Dyal was as familiar with conditions as Munson and was eager to get these potatoes out of Georgetown even at this late date, that the subcharter specifically mentioned "ice conditions," and that the Terne had been held at the pier prior to the storm that arose, not because of any negligence on the part of her captain, but because Dyal had not gotten to Georgetown the potatoes that were to be carried by the Terne.

The delay at Georgetown was caused solely by Dyal.

In considering the stowage, therefore, it must be remembered that there was no special contract between Dyal and Munson to furnish extraordinary and exceptional protection to the potatoes.

Munson on the other hand, was obligated to furnish the usual and ordinary stowage sufficient to meet conditions reasonably to be anticipated. The Hindoustan (C. C. A.) 67 F. 794; The Titania (D. C.) 19 F. 101; The Hog Island (D. C.) 43 F.(2d) 243–246; The Matilde Peirce (D. C.) 29 F.(2d) 794, 795; The Hostetter v. Park, 137 U. S. 30–40, 11 S. Ct. 1, 34 L. Ed. 568.

It should also be remembered that this voyage was one that would take the potatoes from a cold to a warm climate, and was expected to occupy about 2 weeks. It was not for the storage of the potatoes during the winter months.

Prior to the receipt of any of the potatoes on board of the Terne, the holds of that vessel had been preheated and duly inspected, and no cargo battens were found broken or missing.

As to these facts and those of the actual stowage, I prefer the testimony of Buntain, steamship agent of Munson, and of McDonald, in charge of the stevedore work and Bjorset, captain of the ship.

It is unnecessary to state the qualifications of these witnesses. Suffice it to say that the Buntain concern was one of the oldest established businesses of this kind, and that the witness had been actively engaged in loading potato ships for many years.

McDonald had had 27 years as longshoreman, and 15 years as boss stevedore, many years of which was at St. John and the remainder at Prince Edward Island. He claimed to have been the first one to have loaded a potato ship at Prince Edward Island.

Capt. Bjorset was an experienced navigator, and had taken many cargoes of potatoes, especially between Halifax and the West Indies.

The representative of Dyal at Georgetown, Macfarlane, as we have seen, was not called as a witness, nor was his testimony taken by deposition. He also represented the Potato Growers' Association, and that group was interested in seeing that Dyal got only sound potatoes.

The method of stow followed appears to have been the usual and ordinary method in use at that port, despite some of the theoretical attacks made upon it at the trial. It was as follows: Wood dunnage was first placed over the floor of the holds and placed upright along the cargo battens. The floor dunnage was then in turn covered with straw. This also was placed around stanchions or other structures. The bags of potatoes were about 34 inches long, and they were then loaded through the various hatches and received by a gang of stevedores at each hatch, who proceeded to stow them on the port and starboard sides. The bags were stowed 5 to 6 bags in a tier. In the wings of the ship they were stowed tight against the vertical dunnage boards. There was a space of 18 inches separating the bottom tiers from the bulkhead, and the bags were stowed in a series of slight steps.

The 18,000 bags was only a little more than half the load that the Terne could accommodate, so there was ample ventilation both in the stow and over it.

The potatoes themselves generate some slight heat, and the heat from the boiler room also furnished some heat. The purpose of the straw was not to furnish heat, but to prevent chafing of the bags, and thus avoid injury to the potatoes within them as the ship moved.

Altogether there was 5,420 feet of this board dunnage used, and it is estimated that 5,700 feet would have been ample to provide, not only the necessary vertical side dunnage, but a double layer of bottom dunnage, if same had been needed. There was also additional dunnage in the shelter deck of the ship which could have been used if McDonald and Buntain had found it necessary.

They were present and saw the potatoes loaded.

When the ship was examined at North Sidney and later at St. John after her bitter experience in the ice the major portion of the bags of frozen potatoes was found in the bow and stern, as would naturally be expected. There were also frozen potatoes along the sides. The center of the stack of 11,000 bags, two-thirds of the original cargo, however, remained as they were put on at Georgetown, resting on the original board dunnage, with the straw, and were later discharged in Cuba, in good order and condition, after a period of approximately 2 months.

Buntain, who was a witness at the trial, and who was in charge of this stow, with many years of experience, testified: That he had personally been present and was aboard ship every hour or so. That he saw the dunnage placed as he testified. That he saw the ship's officers there and McDonald, the boss stevedore. That the wood dunnage was laid about 4 to 8 inches apart, and straw was then spread on top of this. That the stevedores worked towards the center of each hold, spreading the straw over the dunnage as they went along. That, after four tiers on the side had been placed upright, board dunnage was placed along the sides, and two men would hold the boards back, and the other two of that particular gang would place the bags against these boards to hold them in position. This upright side dunnage was placed two boards to each bag and the boards varied from 5 to 10 feet in length. That he had examined the holds and found no broken cargo battens.

McDonald, who was also a witness, testified, in substance, that the holds had been prepared for the cargo the day before the bottom wooden dunnage was all spread and the upright planks for the sides were laid standing up on ends; that he had examined the holds and found no broken cargo battens; that in the forward and aft ends of the ship the bags were stowed closer, due to the shape of the vessel; that they were kept about a foot or a foot and one-half away from the bulkheads; that, when the stow was completed, there was sufficient wooden dunnage left to spread on top of the cargo in case it should be walked over; that there was no shortage of wooden dunnage; that he heard no calls for dunnage; that he saw no place where straw was used in place of wooden dunnage against the cargo battens; that there had been enough to properly stow the Terne and some left over. He also knew they had wooden dunnage, if necessary, on the shelter deck of the ship.

His attention was called, by counsel for Dyal, to the testimony of several of the stevedores which would contradict his testimony as to there being sufficient dunnage, and he replied that he disagreed with such testimony.

To be sure, Dyal produced the testimony of these several workmen by deposition indicating that there was negligent stowing, but as against such testimony we have the witnesses for respondent and the Terne who were in charge of the work and were present and who testified with particularity that the potatoes were stowed in the usual and customary way at that port, and, it seems to me, that, in view of this testimony, the testimony of a few workmen at different parts and at different times on the ship out of almost four score workmen employed is entirely too uncertain to overcome the direct and positive testimony of these men charged with the responsibility for the work.

I attach more importance to the original loading of these potatoes at Georgetown than I do to the examination subsequently made at St. John, for the reason that, at the prior and superficial examination at Sidney by representatives of Dyal, it would appear that part of it was made along the sides of the ship, and bags were then moved and the vertical dunnage undoubtedly interfered with.

When the Terne subsequently reached St. John, one of the important witnesses for Dyal (Mulcahy) was not aware of this previous superficial examination at Sidney. For instance, Butlin, who went aboard the ship with another witness, Potts, and who was a potato buyer acting as foreman for different potato shippers at that port, first went into No. 4 hatch, and states that, when he and Potts did so, others had been working the cargo when they got there, and had taken some of the bags out of the ship. "They were gradually digging down." "Along the sides." He could not see what the dunnage was along the side of No. 3 hold, and refused to swear that there had been no wooden dunnage along the side that had been taken away by the stevedores as they had dug out the cargo.

O'Connell says there was frost all over the sides of the ship inside.

Mulcahy, the port warden of St. John, in whose presence the hatches of the Terne were

opened, describes the frozen potatoes principally in the wings of the ship. He does say that he found insufficient dunnage, but he also states that he was ignorant of the customary way of stowing potatoes at Georgetown, saying: "I don't know what the practice is in Georgetown." He, however, describes generally the very kind of dunnage for the sides, which was testified to by Buntain and McDonald as having been done at Georgetown saying: "We generally dunnage a ship's sides by laying vertical boards 6 to 7 inches wide and an inch thick, about 6 inches apart up and down the face of the cargo battens. This keeps the bags from the skin of the ship." He also states that the potato cargo has a sufficient heat, and that the frost forms on the side of the ship, and that a certain vapor is created which will go through the hold of the ship and in extreme cold weather freeze.

As I have said, there had been a superficial examination of this cargo at Sidney and the stow somewhat disarranged.

However, Mulcahy sums up the real situation when he states: "You put it (dunnage) there for the protection of your cargo. Under ordinary conditions put a ship in the ice for a month or two months and it is going to freeze anything. You should take ordinary precautions. That is about all a person can do."

The examination, therefore, at Sidney is most indefinite, and the later examination at St. John is insufficient to overcome the direct testimony of the witnesses at Georgetown.

In my opinion, the potatoes were frozen, not because of negligent stowage, that is, stowage not made in the usual and customary manner at that port, but because of the extraordinary exposure of the cargo in a manner not reasonably to be anticipated at the time that the Terne left Georgetown.

Nor, in my opinion, is the fact that additional dunnage was purchased and used at St. John contrary to the view that I have taken, for necessarily the straw and some of the dunnage originally used at Georgetown had become wet and unsafe from the melting frost, and had to be supplanted by new dry dunnage, and also the additional cargo of potatoes, some 6,000 bags, for which Dyal had had the Terne diverted to St. John, required dunnage.

I find, therefore, that the stowage of these potatoes at Georgetown was in the usual and reasonably safe method, and that the injury to the potatoes was caused, not by negligence, but by the exposure of the ship to her extraordinary experience in the ice.

This brings us to the second point as to whether or not faulty navigation was the cause of this exposure?

From Georgetown there were open to the Terne two courses to the open sea. One, southwesterly, 26 miles, through the Gut of Canso. The other, northeasterly, to Cape St. Lawrence, and thence through the waters of Cabot Strait.

Louisberg was the bunkering port for vessels that went through the Gut of Canso. Sidney was the bunkering port for those that went through the Cabot Strait.

The distance of these two ports from Georgetown was approximately the same, in the neighborhood of 160 miles.

It must not be overlooked, however, that all of these waters, in this neighborhood, were ice filled, making travel at night, at any speed, dangerous. It also would appear that under normal conditions, at this time of year, the route through Cabot Strait was not only longer but far more dangerous, and with several of the lights extinguished for the winter.

The captain of the Terne was aware of this, for he had, as we have seen, but shortly come down that way from Corner Brook, Newfoundland. The other route through the Gut of Canso was shorter. The passage was, however, only about a half a mile wide, as this Gut separates Nova Scotia from Cape Breton Island, and is liable, at this time of the year, to be closed by ice, preventing any navigation.

I find no evidence of any official closing of this route. It was a matter of weather conditions and general safety.

The choice of these two routes, therefore, was a matter for the exercise of sound judgment, under existing conditions, by the experienced captain of the Terne. He was apprehensive of the delay, as we have seen, which was enforced upon him by the desire of Dyal to get the rest of its potatoes on board. Nevertheless, the weather had moderated, and two vessels, with potato cargoes, had left, but a comparatively few hours before, and their radios had notified the captain of the Terne that they had made this route, through the Gut of Canso, safely. There were no storm warnings.

I do not see how he should be blamed, in his anxiety to get out of Georgetown as soon as possible and into the open sea, when he de-

cided on this route through the Gut of Canso as the best one. Unfortunately the storm overtook him, and he then decided to take the next best course where he saw open water, but the northwest gale and the movement of the ice closed this passage to him as well. He then found himself in the ice and at the mercy of it, and even the ice breaker Stanley, when it finally succeeded in reaching the Terne, could not extricate herself, but for 5 days both vessels remained in this bitter cold.

The captain kept all the hatches closed. He did everything reasonably possible to conserve the warmth in the hold. In my opinion, I fail to find in the testimony any real constructive criticism of what he should have done.

Counsel for Dyal refers to the publication St. Lawrence Pilot (9th Ed.), duly published by order of the commissioners of the admiralty. I find that that publication has this to say as to Cabot Strait and the Gut of Canso: "Cabot Strait is never frozen completely over but vessels not especially built to encounter ice cannot navigate it safely between January and April inclusive on account of the heavy drift ice which blocks the Strait more specially when the ice forms the Bridge." It then describes this bridge "as the rush of ice out of the Gulf in the spring. That the ice met with in the Strait early in January is generally thin but increases gradually in thickness and that the prevalence of a northwesterly wind drives the ice towards the Strait and that a change of wind from westerly to easterly often clears the ice away from the Strait." As to the Gut of Canso: "This forms a short cut to vessels from the southward proceeding to ports on the southern side of the Gulf of St. Lawrence and on the west coast of Cape Breton Island. It is *by far the best route* for sailing vessels to and from the southern part of the Gulf. The length of the passage through the Gut is 14½ miles. The depth of the water varies from 15 to 31 fathoms. Owing to the ice, navigation is suspended from *about* the beginning of January to the end of April." (Italics mine).

As we have stated, there was no order officially closing the Gut of Canso offered in evidence nor apparently was any such order or direction in existence.

Thorbjornsen, captain of the St. Therese which sailed from Georgetown with potatoes on January 15, in the afternoon, whose deposition was offered in evidence by Dyal, stated that navigation "was not closed when we was there."

Skille, captain of the steamer Evviva, carried a cargo of potatoes out of Georgetown on or about January 7, 1929, just before the Terne arrived and went through the Gut of Canso. He, of course, encountered some ice, but had this to say in answer to a hypothetical question that "if it (ice) was drifting ice I should try to proceed as far as I could to the Gut but if I meet solid ice then I try to go north."

It will likewise be recalled that the radio to the master of the Terne from the vessels that had shortly gone through the Gut indicated that such ice as was encountered "was drifting ice." Owing to the depth of this channel, this sort of ice would not prevent passage. Nor is there any indication that barometric readings would have indicated to an experienced captain that it was unsafe to venture on this course through the Gut so as to constitute negligence or a failure to use prudence and reasonable skill in navigation.

The course through the Gut originally chosen was apparently the best and usual course to be taken by the vessels bound from Georgetown to Cuba. Western Transportation Co. v. Downer, 78 U. S. (11 Wall.) 129, 20 L. Ed. 160; Hostetter v. Park, 137 U. S. 30–40, 11 S. Ct. 1, 34 L. Ed. 568.

The whole matter was a question of the exercise of the best judgment, in the situation, of an experienced mariner. The Mary T. Tracy (D. C.) 298 F. 528–530, reversed on other grounds (C. C. A.) 8 F.(2d) 591–593; The Battler (C. C. A.) 72 F. 537–541; The Garden City (C. C. A.) 127 F. 298–300; The Clarence L. Blakeslee (C. C. A.) 243 F. 365.

Likewise the later change of course from the Gut to Cabot Strait presented an emergency calling for the exercise of sound judgment and cannot be considered negligent or a "deviation" within the legal definition of that term.

A "deviation" is a voluntary departure without necessity or any reasonable cause from the regular and usual course of ship. The Willdomino v. Citro, etc., Co., 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491; Hostetter v. Park, 137 U. S. 30–40, 11 S. Ct. 1, 34 L. Ed. 568; Words and Phrases, First, Second and Third Series, under title "Deviation."

To be sure, there are present the usual theories advanced by expert witnesses for Dyal, but these opinions are based on a set of facts many of which were not before the captain of the Terne when he was faced

with the necessity of decision and which are now covered by the exceptional and later experience of the Terne.

As to the alleged deviation to St. John, this was not proximately caused by the change of the course of the master of the Terne, but was the result of an express agreement between Dyal and Munson and for which Dyal agreed to and did pay. It is likewise shown that Dyal, in sending the Terne to St. John, had in mind more than the reconditioning of the cargo, but intended in this way to increase the cargo to the extent of some 6,000 bags which he had at that port.

Under all the circumstances, therefore, it seems to me that Munson was within its rights in insisting on the payment of these expenses, as it was not at fault. I fail to find any duress.

The final question as to the right of Dyal to recover damages due to the falling of the market at Cuba can be disposed of by the statement that there was no date of delivery specified in the contract between the parties. On the contrary, the obligation rested on Munson to deliver within a reasonable time. Grammer S. S. Corp. v. James Richardson, etc. (C. C. A.) 47 F.(2d) 186.

Moreover, the delay which exposed the Terne to her imprisonment in the ice was caused, probably, by the failure of Dyal to have his cargo ready for loading, so that the Terne could have promptly followed the other ships through the Gut of Canso, as weather conditions indicated she could then have safely done, and the second delay, certainly, by Dyal choosing St. John, a 3 or 4 days' further journey out of the course of the Terne to Cuba; one of the purposes being to take its additional cargo.

I find nothing in the record to indicate any delay on the part of the Terne, or any untoward event in her navigation, from the time she left St. John until she reached Cuba.

Under such circumstances, Dyal has shown no sufficient basis for a recovery of damages caused by the late arrival of the Terne at Cuba.

In my opinion, therefore, libelant has failed to prove a case against either respondent or the claimant and the libel must be dismissed, with costs.

If this opinion is not considered a sufficient compliance with the rule 46½ of the Rules in Admiralty (28 USCA § 723), findings of fact and conclusions of law in accordance herewith may be submitted.