## THE WESTMORELAND.
### No. 41.

Circuit Court of Appeals, Second Circuit.

Nov. 9, 1936.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Ezra G. B. Fox, both of New York City, of counsel), for appellant.

Lynch, Hagen & Atkins, of New York City (Horace T. Atkins, of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

The case comes up upon appeal from a decree for the claimant-respondent in a suit in rem and in personam upon cargo damage. The libellant was the owner of a cargo of sulphate of ammonia for the carriage of which between Everett, Massachusetts, and Norfolk, Virginia, it chartered the barge, "Westmoreland." Towards the end of this voyage while near Cape May, the barge sprang a leak in moderate weather and damaged the cargo. The charter party covered the whole barge and its printed provisions incorporated the Harter Act (46 U.S.C.A. § 190 et seq.), but it also contained the following typed clause: "Cargo to be loaded on skin of vessel at charterer's risk." The charterer stowed the cargo without dunnage directly upon the ceiling over the bilges, made of planks which in some places had cracks above the turn of the bilges, one-eighth to a quarter of an inch wide, through which sulphate of ammonia, a fine powder, could sift. The barge was in excellent general condition and had been in drydock eighteen months or less before the voyage; but as she had carried coal on her earlier voyages, she had to be prepared for this one by cleaning and sweeping out her holds, which took a whole day, though the bilges themselves were not included. She did not leak more than was to be expected in such craft, and her pumps had no difficulty in keeping her dry until she arrived off Cape May on October thirteenth, where for four hours she encountered a cross sea. This, though no worse than was to be expected at that season, made her roll very heavily, and when the bargee started his pumps, he soon found that they would not work properly. The forward one first got into trouble, spitting out a little water ev-

ery nine or ten strokes and then jamming; later the after pump did the same thing. Seeing that something was wrong, he went into the chain locker which was in the forepeak and whose ceiling or floor was some distance above the bilges, how far does not appear, where he found some water and something "like a skin of ice or glue * * * like a plank floating back and forth." This was presumably the sulphate of ammonia which had sifted through the cracks of the ceiling of the hold into the bilges and become congealed by salt water. The pumps being clogged, the water kept gaining in the hold until the vessel reached Norfolk the next morning, causing the damage sued for. The charterer insists that having shown damage by seawater whose entrance is not explained, it is entitled to recover. The owner answers that the leaks were no more than normal, and that the pumps failed to keep them down only because the cargo sifted into the bilges, a risk which the charterer assumed. The charterer replies that the incorporation of the Harter Act imposed as a condition on this assumption that the owner use diligence to make her seaworthy, and that in any case the evidence did not bear out the owner's position as to the leaks.

The charter, being for the whole barge, made her a private carrier and left the parties free to contract as they chose. The Fri, 154 F. 333 (C.C.A.2); The G. R. Crowe, 294 F. 506 (C.C.A.2); The Elizabeth Edwards, 27 F.(2d) 747 (C.C.A.2); The Nat Sutton, 62 F.(2d) 787, 789 (C.C.A.2). Thus the Harter Act was relevant only because the parties incorporated it, and the question arises whether it should override the charterer's express assumption of risk from stowage upon the skin of the ship, a question of interpretation alone. If the law had forbidden them so to stipulate, the second stipulation would have been brutum fulmen; but, that not being true, their first stipulation, that it should be unlawful to change the ship's duties under the maritime law, could not make any the less a contract their second, that these duties should be different in a given particular. The Fri, supra, 154 F. 333, contains an intimation that the specific clause will in that case survive, and there is a dictum to the same effect in The G. R. Crowe, supra, 294 F. 506. On the other hand the Fourth Circuit [The Atlantic Gulf & West Indies S. S. Lines v. Interocean Oil Co., 31 F.(2d) 1006], and the Fifth [The Framlington Court, 69 F.(2d) 300], have held the contrary. As we understand the reasoning it is that the specific clause must be read with a condition, implied from the incorporation of the Harter Act, that the owner must be diligent to make his ship seaworthy. It is true that this still allows some effect to both clauses; but it does violence to the typed one; and in the case at bar it would leave no scope for it at all, for the unfitness of the ceiling was patent upon the slightest inspection. The most reasonable inference is that the parties put in the clause just because they knew that the barge was unfit in this detail and meant not to charge her on its account. This did not deny all effect to the clause incorporating the Harter Act, which still gave the owner the advantage of section three, if he could show himself diligent in making the barge seaworthy in other respects, and which read the same condition into all other exculpating clauses. So far as the two decisions cited must be construed to deny an unconditional reading of the typed clause we cannot therefore go along, and we conclude that if the damage arose solely from stowing the cargo directly upon the ceiling, it was on charterer's account alone.

We are not disposed to disturb the finding below that the defective ceiling was the barge's only fault. When she began to work in the beam sea, not only would the ammonia be jostled through the cracks, but the wash of the bilge water would carry it directly down into the bilges and so to the suctions. It is of course possible that the barge leaked unduly and that this contributed to the damage; but that is at best doubtful. The bargee's testimony is vague and inconsistent; it is not clear how much water he found in the chain locker, or when he started the pumps. At one time he said that he had seen eighteen inches of water; at another only that his feet were wet in a gummy "mess." Moreover, we are not clear how the mixture of ammonia and water could have penetrated into the locker unless the bottom included the bilges, which apparently it did not. Again he was very uncertain as to when he started his pumps. The libellant makes much of all this, as well as of the caulking done at the survey, some of which was at the stem. But the general testimony, not only of the bargee, but of the drydock superintendent, was that the barge was in good

condition; and caulking is not necessarily evidence of unseaworthiness. We can easily see how the damage could have happened without more leaking than the pumps could have controlled if they had not clogged. In a heavy cross sea the vessel would roll unduly, being loaded to less than half capacity, and might make a good deal more water than ordinarily. Once the pumps stopped, this would surge into the wings and through the ceiling, wetting the sides of the cargo, just where the damage was found. This being consistent with the testimony that the barge was tight and staunch, it was for the trial judge to decide how far the inconsistencies of the witnesses discredited their statement that she was; he saw them and he best could judge. Though the owner had the burden of proving his ship seaworthy, he was not bound to straighten out every kink in the testimony of his witnesses; especially in maritime cases and with witnesses not skilled in the use of words, it is the general impression that counts, and that the record does not preserve.

Decree affirmed.