**THE TOLEDO.**
Nos. 15576, 15578.

District Court, E. D. New York.
Oct. 13, 1939.

Bigham, Engler, Jones & Houston, of New York City (James W. Ryan, of New York City, of counsel), for libellant.

Haight, Griffin, Deming & Gardner, of New York City (John W. Griffin, Wharton Poor, and Stanley W. Schaefer, all of New York City, of counsel), for claimant and respondents.

CAMPBELL, District Judge.

By order of this Court, dated February 6, 1939, the two Admiralty causes Numbers 15,576 and 15,578 were consolidated under the title hereinbefore set forth.

This is a suit by the Isbrandtsen-Moller Company, Inc., a New York corporation, against the Norwegian Motorship Toledo, in rem, and Wilh. Wilhelmsen, alleged to be the owner, and against the Tankfart corporations, the actual owners, in personam. Wilh. Wilhelmsen is managing owner, but not the actual owner. The Tankfart corporations are the actual owners.

Respondents have appeared and security has been given to cover a decree against them, as well as against the ship.

The said respondents are Norwegian corporations, and do not have offices or places of business in the Eastern District

of New York, but had chattels or personal property within the Eastern District of New York consisting of the Norwegian Motorship Toledo.

The libellant is seeking recovery on two distinct claims, (1) as time charterer of the ship and (2) as bailee and assignee of the cargo.

It is necessary to keep clearly in mind the two different capacities in which libellant sues, and I will, therefore, consider them separately in their order.

The charterparty, which was on the Government-New York Produce Exchange time form for the carriage of a full cargo on a single trans-Atlantic trip from ports north of Hatteras named by the charterer (Philadelphia, Chester and New York) to continental European ports in the Hamburg-Havre range (London, Antwerp and Rotterdam), governs the relations between the charterer and the shipowner.

. . The charterparty recites that "hull and machinery and equipment" are "in a thoroughly efficient state" and provides that the owners "agreed to let, and the charterers agreed to hire the said Steamship from the time of delivery for one transatlantic trip" as hereinbefore described. "Charterers to have liberty to sublet the Steamer for all or any part of the time covered by this Charter, but Charterers remaining responsible for the fulfillment of this Charter party". The vessel is to be delivered North of Hatteras "being on her delivery * * tight, staunch, strong and in every way fitted for the service * * *, to be employed in carrying, lawful merchandise, including petroleum or its products, * * * in such lawful trades, between safe port and/or ports * * * in the voyage described above."

Paragraph 1 of the charterparty provides, among other things, that the owners shall "keep the Steamer in a thoroughly efficient state in hull, machinery and equipment for and during the service".

Paragraph 15 provides: "That in the event of loss of time from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost * * *."

Paragraph 16 provides: "The act of God, enemies, fire, restraint of Princes,

Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted."

Paragraph 19 of the charterparty, I will discuss further on in my opinion.

■ There was, under the charterparty, a warranty that the Toledo was seaworthy both at the time of the making of the charter, and of the delivery of the ship to the libellant. The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; The Carib Prince, 170 U.S. 655, 18 S.Ct. 753, 42 L.Ed. 1181.

The evidence clearly shows that the ship was not seaworthy at these times.

■ The charterparty was, however, a private contract and not a contract of common carriage, and the relations between the owner and the charterer are not altered if the charterer chooses to put the ship on the berth and offer her to shippers as a common carrier. In this instance the parties were free to contract as they desired, and the agreement they made is not subject to the considerations of Public policy, which limits the agreement of common carriers. The Fri, 2 Cir., 154 F. 333; The G. R. Crowe, D.C., 287 F. 426, affirmed 2 Cir., 294 F. 506; The Oakley C. Curtis, 2 Cir., 4 F.2d 979; The Westmoreland, 2 Cir., 86 F.2d 96; The Nat Sutton, 2 Cir., 62 F.2d 787; The Elizabeth Edwards, 2 Cir., 27 F.2d 747; The Lawrence J. Tomlinson, D.C., 29 F.2d 797.

■ Considerable testimony was offered in an attempt to show a custom whereby if the interval between the delivery date and the cancelling date is a short one, an inference may arise that a fixed sailing date is contemplated and that therefore very likely the ship is going to be put on the berth on line service. It does not seem to me that the evidence offered sustains that contention, but, in any event, I do not think that this constituted notice to the owner that the ship was to be put on the berth, but even if it was the contract of charter between the owner and libellant was a private contract, and was not affected by the fact that the time charterer might put the vessel on the berth as a general ship. Robinson on Admiralty, page 467.

The charterparty did contain an exception in Paragraph 16, supra, which provided "accidents of * * * machinery, * * * throughout this Charter Party al-

ways mutually excepted", but the parties of this suit contend for entirely different constructions of this paragraph.

Libellant contends that the exception last quoted does not eliminate or restrict the shipowners absolute warranty of seaworthiness, nor is it equivalent to the usual and clear clause "warranted seaworthy only insofar as use of due diligence can make the vessel seaworthy".

Respondents contend that every provision of the charterparty is subject to the exception, including the agreement that the ship shall be seaworthy.

It is undoubtedly true that the implied warranty of seaworthiness will only be excluded by expressed terms in the contract, so clear as not to admit of any such construction.

It has likewise been held that where the exception is included with many others that relate to the ship during its operation, it will be held that the exception limits the implied contract of seaworthiness, only by accidents occurring after the making of the charter. The Caledonia, supra.

The charterparty in question is on the form which has been largely used, and I find no case in which it has been held that Paragraph 16 eliminates the implied warranty of seaworthiness, therefore, it seems to me that the proper construction is, that the ship and its owner are relieved from accidents occurring to machinery, after the making of the charterparty, even if the ship was unseaworthy at the time of the making of the charterparty and the delivery of the vessel to the charterer. The reference in the charterparty to the Harter Act, 46 U.S.C.A. § 190 et seq., to give the ship the benefit of that Act's defenses, does not destroy or weaken the exceptions. The Westmoreland, supra. That, is especially true in this case, where the evidence shows that due diligence was exercised to make the ship seaworthy.

It is contended on behalf of libellant that the fracture of the web of the crankshaft was not an excepted peril of "accidents of machinery" which relieved the respondents of their contractual and unqualified promise in writing to deliver the Toledo to the libellant at the beginning of this voyage on December 15th, 1938, in seaworthy condition.

It is true that there was a fracture of the web of the crankshaft at the time when the ship was delivered to the charterer, and that the breaking was in an area where the material was poor, and had been poor, from the time the ship was built. This defect was a latent defect. Whether the break was originally started by the propeller blades coming into contact with heavy logs in the Mississippi River, or some other cause, the fact is that the crankshaft was used without any knowledge of its defective condition, although examinations of the kind ordinarily made, were made, without showing the fracture of the web of the crankshaft, and the ship endured the voyage from New Orleans to Philadelphia without showing any defect, and this, of itself, would be quite persuasive with the surveyors, as to the condition of the machinery. This is not, in my opinion, the same as a ship which suffers from gradual decay, but this fracture of the web of the crankshaft took place after the commencement of the charter and while the ship was on its way from Philadelphia to New York, and the fracture of the web of the crankshaft was an accident to machinery. The Miranda, L.R. 3 A. & E. 561.

The libellant, as time charterer, is entitled to an adjustment of hire and bunkers as of the time of the breakdown, as provided by paragraph 15, supra.

In any event, the libellant, as time charterer, could not recover anything in addition to the adjustment of hire and bunkers, except lost freight, which could be only as to the apples, but, even if they were entitled to any recovery, other than that provided in Paragraph 15 supra, which is the stipulated and exclusive measure of damage, there could be no recovery for lost freight on the apples, as the proof is altogether too remote.

We will now consider the claim of the libellant as to bailee and assignee of cargo.

Paragraph 19 of the charterparty provides as follows: "If the Owners of the ship shall have exercised due diligence to make said ship in all respects seaworthy, and properly manned, equipped and supplied, it is hereby agreed that in case of danger, damage or disaster resulting from fault or negligence of the pilot, master or crew, in the navigation or management of the ship, or from latent or other defects, or unseaworthiness of the ship, whether existing at time of shipment or at the beginning of the voyage, but not discoverable by due diligence, the Consignees

or Owners of the cargo shall not be exempted from liability for contribution in General Average, or for any special charges incurred, but with the Shipowner, shall contribute in General Average, and shall pay such special charges, as if such danger, damage, or disaster had not resulted from such fault, negligence, latent or other defect, or unseaworthiness."

The dock receipts, issued by the libellant when the goods were delivered to it, provided: "The goods are accepted for shipment subject to provisions of Company's usual bill of lading as revised to date."

The terms of this form of bill of lading were binding on the cargo from the time of this receipt by the charterer, whether or not the goods were loaded or bills of lading actually issued. Luckenbach S. S. Co., Inc., v. American Mills Co., 5 Cir., 24 F.2d 704; Eastern Outfitting Co. v. Pacific Mail S. S. Co., D.C., 26 F.2d 270.

The bills of lading actually issued were the customary form contemplated by this dock receipt, and contained with others the following provisions: "This bill of lading shall have effect subject to the provisions of the 'Carriage of Goods by Sea Act' of the United States of America [46 U.S.C.A. § 1300 et seq.], and the carrier (which term shall be deemed to include the ship and the shipowners) shall be entitled to avail itself of all the rights and immunities and all other restrictions upon liability contained in said Act, and shall not be deemed to have surrendered any of its rights or immunities or restrictions upon liability or to have increased any of its responsibilities or liabilities."

Paragraph 1 provides that the ship "as part of voyage" may, "with or without the goods on board and before or after sailing, or at any stage of the voyage * * * drydock, go on ways, or to repair yards".

The bills of lading also contain the following provisions:

"In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the shipowner is not responsible, by statute or contract or otherwise, the shippers, consignees or owners of the cargo shall contribute with the shipowner in General Average, to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo * * *.

"Prepaid freight is to be considered as earned on shipment of the goods and is to be retained by the carrier, cargo lost or not lost; or if there be a force interruption or abandonment of the voyage at a port of distress or elsewhere; and in the event of the cargo or a part of it being forwarded by vessels of the same Line or otherwise, the cost of forwarding shall be payable by the owners or consignees of the goods, and shall constitute a lien on the goods."

The freight was prepaid in the great majority of cases. All of the cargo was shipped under bills of lading in the above form except that there were four bills of lading, freight prepaid, for small lots in the Uniform Through Export Bill of Lading form.

There was also incorporated in said bills, by reference, the Carriage of Goods by Sea Act and the following provisions:

"The Ocean Carrier shall not be liable for loss or damage occasioned * * * by explosion, bursting of boilers, breakage of shafts or any latent defect in hull, machinery or appurtenances or unseaworthiness of the vessel, whether existing at the time of shipment or at the beginning of the voyage, provided the owners have exercised due diligence to make the vessel seaworthy * * *, nor for any loss or damage caused by the prolongation of the voyage.

* * *

"If the owner shall have exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped and supplied, it is hereby agreed that, in case of danger, damage or disaster, resulting from faults or errors of navigation, or in the management of the vessel, or from any latent or other defects in the vessel, her machinery or appurtenances or from unseaworthiness, whether existing at the time of shipment or at the beginning of the voyage (provided the latent or other defects or the unseaworthiness was not discoverable by the exercise of due diligence), the shippers, consignees and/or owners of the cargo shall nevertheless pay salvage and any special charges incurred in respect to the cargo, and shall contribute with the shipowner in General Average * * *.

* * *

"The property covered by this bill of lading is subject to all conditions expressed in the regular form of port bill of lading in use by the steamship company * * * and if any of such conditions are in conflict with conditions 1–15 of Part II of this bill of lading, the latter conditions shall control."

The Carriage of Goods by Sea Act provides as follows:

"Sec. 4. (1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 3 [1303 of this title]. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

"(2), Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;

* * *

"(p) Latent defects not discoverable by due diligence; and

"(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage." 46 U.S.C.A. § 1304.

In its capacity as bailee and assignee of cargo, libellant is in the same position as would be the cargo owners, and it, and they can recover only on showing that the shipowners failed to use due diligence to make the ship seaworthy.

The bills of lading and the Carriage of Goods by Sea Act quoted supra, govern the rights of the parties.

Under that Act there is no warranty of seaworthiness, and the shipowner is not liable for unseaworthiness, unless it results from lack of due diligence nor for latent defects not discoverable by due diligence.

As I have hereinbefore found the warranty of seaworthiness contained in the charter party was modified by the exception clause as to accidents of machinery happening after the making of the charter, and delivery of the ship to the charterer, and the most that the cargo owner can require of the shipowner is to have used due diligence to make the ship seaworthy, the portion of the machinery, the condition of which rendered the ship unseaworthy, was the No. 3 web.

The vessel was built by a high class builder at the Odense Yard in 1926, and her engines were built by Burmeister & Wain, one of, if not the leading, Diesel Engine builders of the World. She was built under Lloyd's inspection, and Lloyds tested the material which went into her, including the No. 3 web. She received the highest class in Lloyds, which she still had at the time of the accident. Regular surveys, called for by Lloyds rules, were had from the time she was built, the last regular periodical survey of hull and engines having been made by Lloyds at Gothenberg in July 1938, about five months before she entered upon the charter to the libellant.

The vessel and her engines have been carefully supervised and kept in good condition, and all recommendations for renewals and upkeep have been carried out. The regular Norwegian inspection was made and passed in July, 1938.

Lloyds made continuous part by part surveys of the engines, that covering the No. 3 web having been held on February 27th, 1937, at Baltimore.

The Toledo, when she entered on charter December 15th, 1938, had a full complement of competent and satisfactory officers and crew, and she was properly equipped and supplied.

The webs, of which No. 3 is in question, are heavy pieces weighing some four tons each, which connect the shafting with the connecting rod, and form the crank by which the connecting rod turns the shaft.

There is a web on each side in the assembly for each cylinder, there being, in the Toledo, twelve webs for the six cylinders. The webs are rough castings, not being machined, or polished, but the surface is fair-

ly uneven, showing chisel marks where gates, etc., have to be cut away by cold chisel.

In their use the webs become covered with oil, carbon and dirt.

Such a web ordinarily lasts the life of the ship. The breakage of a web in a built-up shaft like that on the Toledo is not common, but it has happened, but none of the experts testified to a case where the fracture of a web was caused by a blow on the propeller.

The web in question had been made in accordance with the rules, and good practice established by Lloyd's Register, and inspected by their surveyor during construction, and had never given any trouble during its twelve years of service.

There was no indication of any difficulty during the run of the ship from New Orleans on December 7th, 1938, to Philadelphia, on December 13th, 1938.

A regular inspection of the engines of the ship, made by the engineers of the ship at Philadelphia on December 13th and 14th, 1938, during which the crankshaft was inspected, showed nothing wrong. The sufficiency of this inspection is denied by the libellant, but it seems to me to have been that which would be regularly made.

The Toledo was delivered to the libellant under the charter party at Philadelphia on December 15th, 1938, where she loaded some cargo. On December 17th, 1938, she proceeded to Chester, where she loaded additional cargo, and on December 20th, 1938, at 2:30 P.M., she sailed for New York. There had been no indication of any trouble up to that time.

At about 4.15 on that afternoon, while the Toledo was proceeding to New York, an unusual noise was heard by the engineers on watch, who could not tell where it came from. They went over the engines, listening carefully, and also looked in the machine shop, and the storeroom, to see if anything had fallen, but everything appeared to be normal. A report was made to the Chief Engineer, who went down and listened carefully to the working of the engines, which appeared to be performing normally.

Because of this happening, the engines of the ship were re-examined on December 21st, 1938, when the Toledo reached New York, and the fracture of the web was discovered.

The charterer was at once informed and the loading was stopped.

The real cause of the accident was defective metal at the point of the fracture, which had existed from the time of manufacture, and was a latent defect not discoverable by external inspection.

On December 4th, 1938, while navigating in the Mississippi River, the blades of the propeller struck something which was supposed to be a log. All the expert witnesses agreed that such a blow would not have fractured a normal web, and it is to be observed that no effect was produced by such blow on any of the eleven other webs, or on the tail shaft, which is the most vulnerable part of the shafting.

There is a sharp conflict in the opinions of the expert witnesses, some contending that the blow might have contributed to the fracture in the sense of being sort of a last straw, while the others contended that it had nothing to do with the fracture of the web, but that the defective metal simply reached the end of its endurance.

It is unnecessary to enter into a consideration of the testimony of each expert, as to the area of the defective material or whether the defects in each subdivision of the area appeared at different times, as all agree that in that area where the fracture occurred, the metal was spongy and defective, and I find that it must have been spongy and defective from the time of manufacture.

On all the evidence, I find that the fracture was not discoverable before the vessel was delivered to the charterer, or before loading started at Philadelphia, by any test which would ordinarily or customarily be made, and that is all that is required to show due diligence, by the shipowners. The Emelia, D.C., 13 F.Supp. 7, at page 9.

I can not agree with libellant that there was lack of due diligence, because in the inspections made prior to the arrival of the Toledo at New York the web was not white washed or chalked, as that was not a customary way of testing machinery aboard a vessel. If the owner should be required to make that test as to the web in question, to show due diligence, he would also be required to make the same test as to the eleven other webs.

Such a test might be made in a laboratory, but would not customarily be made aboard a vessel.

I cannot agree with libellant that the third engineer did not allow the oil to drain off the web for a sufficient time before testing, because he allowed a much longer

time for draining than Mr. Ford, one of libellant's experts said would be required. The outstanding fact was, that the ship had made the voyage from New Orleans to Philadelphia, after the striking of the object by the propeller in the Mississippi River, without any engine trouble, and this, to the average engineer and expert would be considered as a very good test.

Libellant's contention that it made contracts for sailing by specific dates, does not seem to me to have been established, as no date of sailing was shown in the dock receipts, in fact, they gave liberty to substitute any other steamer, and it appears on the face of some of them that they had originally named earlier vessels and had been changed to name the Toledo. Similar liberty was given by the bills of lading. It may have been that there was an advertised sailing date, but it does not seem to me that any notice of a specific sailing date was given to respondents.

I do not agree with libellant that the Master ordered the charterer to stop loading, and this charge was not made until after the Master had testified by deposition, and could not be recalled.

On all the evidence it does not seem to me that there can be any finding that the fracture was caused or contributed to by the alleged contact of the propeller with floating logs. The damage to the propeller was trivial and the bending of the propeller blades was not sufficient to affect the seaworthiness of the ship, and even after the survey at New York, it can not be said, with any certainty, that the damage to the propeller was the cause of the damage to the web.

I can not agree with libellant that the Master of the ship tried to conceal the damage to the propeller blades, on the contrary, it appears to me that his complaint was that the Chief Officer of the ship had given information without his, the Master's, knowledge.

There was no liability on the part of the libellant to transship or to forward by another vessel and, therefore, whatever the libellant did, and whatever it expended for that purpose, was voluntary, and it can not recover the same from respondents.

As I view it, the only disaster that overtook the ship was the breaking of the web, as it does not seem to me that the bending of the tip of a propeller blade was a disaster, but even if it was, it certainly was not a disaster to encounter a rough sea in crossing the Atlantic, and there is no evidence of any disaster other than the one in question, as the repairs made at the dockyard were probably all the repairs needed on the ship, in addition to the web, and the propeller, and amounted to only $185.60.

The subsequent entry in the log book of the entry with reference to striking something in the Mississippi, was not a tampering with the logs but merely the entry of something which had not attracted attention at the time, but received more serious consideration after the fracture of the web was found, and I see no reason to doubt that the Master and Engineers did not consider the striking of some object in the Mississippi, as in any way contributing to the damage of the web.

The failure to call Mr. Laing of New Orleans is not subject to criticism, as he did not inspect the ship, and was employed only to inform Counsel.

Likewise, the failure to call the Lloyd surveyor, at New Orleans, is not a subject for criticism, as he never examined the web and, therefore, it can not be said that the failure to call either of those witnesses creates a presumption that, if called, they would testify against the respondents.

The motion to strike out the second amended answer is denied.

It did not prejudice the libellant in any way, as it did not change the issues, but simply amplified the details of the charter-party, bills of lading and statutes, relied upon.

With reference to the exceptions, I see no reason for further discussion, as in my decision of this case, I have passed upon the sufficiency of the defenses, pleaded.

As to the first cause of action, the libellant is entitled to recover from the respondents of a proper proportion of unearned charter hire and unused bunkers, and in all other respects, and also, as to the second cause of action the libel should be dismissed.

As both parties have, in part, succeeded, and in part, lost, the libellant is entitled to recover one-half costs.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law, in accordance with this opinion, for the assistance of the Court, as provided by the Admiralty Rules, 28 U.S. C.A. following section 723, and the Admiralty Rules of this Court.